542 A.2d 985

The **TOWNSHIP OF CHARTIERS**, Petitioner,

v.

**WILLIAM H. MARTIN, INC. and Chambers Development Company, Inc., Respondents.**

Supreme Court of Pennsylvania.

Argued Dec. 10, 1987.

Decided May 20, 1988.

182

Stanley R. Geary, James P. Liekar, Pittsburgh, James P. Liekar, Canonsburg, for petitioner.

David G. Reis, Ralph Scalera, Pittsburgh, Scott H. Fergus, Washington, for respondents.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT and PAPADAKOS, JJ.

## OPINION

McDERMOTT, Justice.

The respondents here (hereinafter "Chambers") are landfill operators. They operate their business at several loca-

tions in Pennsylvania. The one at issue here is a 160 acre facility in Chartiers Township. The physical characteristics of this tract are such that the landfill contains two distinct valleys surrounded by a buffer area of varying dimensions no less than 25 feet at any given point. The west valley is comprised of approximately 30 acres and the east valley totals approximately 50 acres. Until the time of this litigation waste disposal had occurred exclusively in the west valley, with soil cover operations primarily taking place in the east valley. However, Chambers had prepared the east valley for eventual dumping, and is presently utilizing this valley in its operations.

The site is located in a portion of Chartiers Township zoned residential, and therefore the operation and maintenance of the landfill is not a use permitted as of right. However, it exists as a legal nonconforming use under the Chartiers Township Zoning Ordinance.

At the turn of the century both valleys were used for burning refuse; and prior to Chambers' involvement, William H. Martin, Inc., presently a subsidiary of Chambers, operated the property as a sanitary landfill. Chambers subsequently converted the landfill into a modern waste treatment plant facility, fully licensed by the Pennsylvania Department of Environmental Resources (hereinafter "DER"). Under the present DER permit, which covers the entire 160 acres and calls for the landfill operations in both valleys, Chambers is authorized to process a maximum daily volume of 2,000 cubic yards or its equivalent in tonnage.

Troubles between respondents and Chartiers Township began when Chambers contracted with four New Jersey counties to accept their waste. This resulted in an increase in daily tonnage intake at the landfill. Disposal sites are at a premium everywhere, and those localities that have them are jealous of their use. The first to respond to the new contracts was the DER, who notified respondents that they intended to issue new regulations restricting the intake volume of solid waste that a landfill might accept, and that a significant increase above the daily allowed volume of

2,000 cubic yards or its equivalent in tonnage would require permit modification. Accordingly, respondents filed for a new permit with DER, and filed an equity action in Commonwealth Court challenging the legality of the new regulations.[1] For the present it is sufficient to say that those contentions are now being pursued and argued in their natural course, and are not the issues presently before us. What is before us is the basic contention of Chartiers Township that the increased use of the trash site is an expansion of a pre-existing nonconforming use that requires a zoning variance.

Chartiers Township moved in the Court of Common Pleas of Washington County to enjoin what they perceived to be an illegal expansion of the pre-existing use. They were successful at the trial court, which enjoined the dumping of increased tonnage, and unsuccessful in Commonwealth Court, which lifted the injunction against respondents. The Township is asking this Court to assume plenary jurisdiction and vacate the stay granted by Commonwealth Court, and to reinstate the trial court's preliminary injunction.

Thus the germane issue is whether the stay pending appeal in this matter was properly entered by Commonwealth Court; for it is only from this order that the Township appeals to this Court.

1. In addition to the equity complaint Chambers concurrently filed with the court an application for a preliminary injunction seeking to enjoin DER from implementing and enforcing its new daily volume program as it applied to Chambers. Two days later, Commonwealth Court granted the injunction. DER appealed the order to this Court and also filed preliminary objections challenging the failure of Chambers to exhaust its statutory remedies. On October 26, 1987, Commonwealth Court sustained DER's preliminary objections, and also dissolved the injunction entered against DER. *See Chambers Development Company, Inc. v. Department of Environmental Resources*, 110 Pa.Cmwlth. 432, 532 A.2d 928 (1987). In light of that this Court on November 24, 1987, issued a *per curiam* order dismissing DER's appeal of the injunction as moot. Chambers also appealed the October 26, 1987, Commonwealth Court order sustaining DER's preliminary objections to this Court. We in turn treated this appeal as a petition for allowance of appeal, and denied the petition on November 24, 1987.

The law on this issue was enunciated by this Court in *Pennsylvania Public Utility Commission v. Process Gas Consumers Group,* 502 Pa. 545, 467 A.2d 805 (1983), wherein we held that the grant of a stay is warranted if the following criteria are met:

1. The petitioner makes a strong showing that he is likely to prevail on the merits.

2. The petitioner has shown that without the requested relief, he will suffer irreparable injury.

3. The issuance of a stay will not substantially harm other interested parties in the proceedings.

4. The issuance of a stay will not adversely affect the public interest.

*Id.,* 502 Pa. at 552–53, 467 A.2d at 808–09. As a rule each criterion must be independently satisfied; however, a "court, when confronted with a case in which the other three factors strongly favor interim relief may exercise its discretion to grant a stay if the movant has made a substantial case on the merits." *Id.,* 502 Pa. at 553, 467 A.2d at 809 (citations omitted).

We now must review the standards set forth in *Process Gas* in light of the evidence in this record. Regarding Chambers' likelihood of success on the merits of its appeal, we must first examine the standards applicable to the entry of a preliminary injunction. This Court has held that the essential prerequisites for the issuance of a preliminary injunction are as follows:

... first, that it is necessary to prevent immediate and irreparable harm which could not be compensated by damages; second, that greater injury would result by refusing it than by granting it; and third, that it properly restores the parties to their status as it existed immediately prior to the alleged wrongful conduct... *Even more essential, however, is the determination that the activity sought to be restrained is actionable,* and that the injunction issued is reasonably suited to abate such activity. And unless the plaintiff's right is clear and the

wrong is manifest, a preliminary injunction will not generally be awarded. (citations omitted).

*Valley Forge Historical Society v. Washington Memorial Chapel*, 493 Pa. 491, 500, 426 A.2d 1123, 1128 (1981) (emphasis supplied).

Therefore, the threshold issue is whether the Township, as the moving party, had an actionable claim against Chambers, the nonmoving party. This in turn requires us to decide whether Chambers' activity constituted an expansion of a nonconforming use in violation of the Chartiers Township Zoning Ordinance.[2] The principles governing the increase or expansion of a nonconforming use are set out below.

In 1927, this Court first enunciated what is now commonly known as the "natural expansion doctrine", wherein we held that to a certain extent a nonconforming use can expand as a matter of right. The Court, addressing a business' attempt to build storage space, stated:

[the] business had been established at its present location long before the passing of the zoning ordinance and was actively conducted at the time the ordinance went into effect; accordingly, as the property was then used for lawful purposes, the city was without power to compel a change in the nature of the use, or prevent the owner from making such necessary additions to the existing structure as were needed to provide for its natural expansion and the accommodation of increased trade, so long as

**2.** Section 901.6 of the Chartiers Township Zoning Ordinance pertains to expansions of a nonconforming use and provides as follows:

901.6 EXPANSION OR EXTENSION OF NON–CONFORMING USES

a. Natural and reasonable expansion and extensions of non-conforming uses not in excess of 25% and in accordance with this Ordinance may be permitted by the Zoning Hearing Board after public hearing under these conditions:

(1) The owner or operator desiring such expansion or extension shall file an application with the Building Inspector who shall thereupon set the matter for hearing before the Board.

(2) Any use which is substantially different from the original non-conforming use shall be prohibited.

(3) Additional parking area of itself shall not be considered an expansion.

such additions would not be detrimental to the public welfare, safety and health.

*Gilfillan's Permit,* 291 Pa. 358, 362, 140 A. 136, 138 (1927). *See Silver v. Zoning Board of Adjustment,* 435 Pa. 99, 255 A.2d 506 (1969); *Jackson v. Pottstown Zoning Board of Adjustment,* 426 Pa. 534, 233 A.2d 252 (1967).

Later, in *Cheswick Borough v. Bechman,* 352 Pa. 79, 42 A.2d 60 (1945), the operators of a sand and sand loam business sought to extend their operations in depth and area. In determining that this extension of the business was proper, this Court stated:

> The business carried on was the excavation of loam and sand loam. It is not essential that the use, as exercised at the time the Ordinance was enacted, should have utilized the entire tract. To so hold would deprive [the owners] of the use of their property as effectively as if the Ordinance had been completely prohibitive of all use. This result could not have been intended.

*Id.,* 352 Pa. at 82, 42 A.2d at 62. In *Humphreys v. Stuart Realty Corporation,* 364 Pa. 616, 73 A.2d 407 (1950), we also stated:

> that a non-conforming use cannot be limited by a zoning ordinance to the precise magnitude thereof which existed at the date of the ordinance; ... neither is it essential that its exercise at the time the ordinance was enacted should have utilized the entire tract upon which the business was being conducted.

*Id.,* 364 Pa. at 621, 73 A.2d at 409. *See Grubb Appeal,* 395 Pa. 619, 151 A.2d 599 (1959); *Pierce Appeal,* 384 Pa. 100, 119 A.2d 506 (1956); *Mack Zoning Appeal,* 384 Pa. 586, 122 A.2d 48 (1956).

Furthermore, this Court has held that a change in instrumentality will not defeat the purpose or existence of a nonconforming use.

> Neither the natural growth of a business, existing at the time of the enactment of a zoning ordinance, nor adoption thereafter of more modern instrumentalities, suitable and

helpful in carrying on the business, works a change of use in legal contemplation.

*Firth v. Scherzberg,* 366 Pa. 443, 449, 77 A.2d 443, 446 (1951). *See Davis Appeal,* 367 Pa. 340, 80 A.2d 789 (1951).

 Thus, once it has been determined that a nonconforming use is in existence, an overly technical assessment of that use cannot be utilized to stunt its natural development and growth. As Mr. Justice Musmanno aptly stated, "[a]n ordinance which would allow the housing of a baby elephant cannot evict the animal when it has grown up, since it is generally known that a baby elephant eventually becomes a big elephant." *Upper Darby Township Appeal,* 391 Pa. 347, 354, 138 A.2d 99, 102 (1958).[3]

██ Given these parameters it would seem, *as a matter of zoning law,*[4] that Chambers had an absolute right to increase the daily volume of intake, and to utilize the east valley, without the necessity of obtaining a variance. This is so because Chambers was not changing the intended use of the property, and was not expanding the use beyond the area which was contemplated for such use at the time the landfill became nonconforming. The trial court however, did not so find, and relied on certain Commonwealth Court authority which seemed to imply that a change in method or quantity of production of a nonconforming use could constitute an entirely new use, even though the original intent of the use remained the same.[5] Specifically, in *Putkowski v. City of Scranton,* 58 Pa. Cmwlth. 604, 428 A.2d 743 (1981),

3. Finally, we note that the doctrine of natural expansion does not apply to dimensional, space, lot size, design, structural or aesthetic restrictions of a nonconforming use as proscribed by a zoning ordinance. *Miller & Son Paving Inc. v. Wrightstown Township,* 499 Pa. 80, 451 A.2d 1002 (1982). However, this clearly is not the case before us since there is no dispute that Chambers is not seeking to extend its landfill operations beyond the original 160 acre boundary.

4. We wish to imply no decision whatsoever as to Chambers' right to increase dumping versus DER's right to limit such dumping to a daily maximum.

5. The trial court found that Chambers employed two new cranes to handle the increased tonnage, and that this increase in capacity altered the nonconforming use.

the authority relied on by the lower court, the Commonwealth Court determined that the introduction of a more modern instrumentality, there a mechanical car crusher, would in effect so drastically alter the nonconforming use as to render it a new and different use under the zoning ordinance. *See, e.g., Township of Kelly v. Zoning Hearing Board,* 36 Pa. Cmwlth. 509, 388 A.2d 347 (1978); *Casilio and Sons v. Zoning Hearing Board of the Township of Stroud,* 26 Pa. Cmwlth. 608, 364 A.2d 969 (1976).

The rationale underlying *Putkowski* may be valid in its own right. However, it appears to contradict what this Court has previously said; that is, that the operator of a nonconforming use may incorporate modern technology into his business without fear of losing that business. *See Davis Appeal, supra; Firth v. Scherzberg, supra.*

■ Perhaps the motivation behind *Putkowski,* i.e., that in today's fast changing world a modern innovation can alter a use so dramatically as to place it beyond what was ever intended to be allowed, will force us one day to reconsider our prior decisions. However, the fact remains that at the time of this litigation the controlling law in this subject favored Chambers' position. Thus, in its application for a stay, Chambers did successfully satisfy the first prong of the *Process Gas* criteria, since it appears that the Township had no actionable claim against Chambers for the accelerated use of its property.

We now must proceed to consider the other criteria of *Process Gas.* As noted above, the second prong of that criteria is whether the petitioner for the stay, Chambers in this case, has shown that it will suffer irreparable injury.

At the hearing before the trial court, a vice-president of operations for Chambers testified that the company would be affected severely and suffer irreparable harm should it be precluded from accepting the New Jersey waste. In the past Chambers has used increased revenues to help offset the escalating costs associated with the operation of the landfill. Without this additional revenue, Chambers contended, this would be impossible and consequently the com-

pany could foresee an increase in price to local communities utilizing the site. Furthermore, Chambers maintained that the above scenario would necessitate a reduction in personnel hired to accommodate the increased business. Finally, the company argued that it will suffer both loss of reputation and future business should it be unable to comply with these contracts. Since these allegations were not challenged by the Township at the hearing we will accept them as evidence of the irreparable harm Chambers will suffer should the stay not be granted.

The remaining criteria of *Process Gas* require the court to determine whether the issuance of the stay will substantially harm other interested parties, and whether it will adversely affect the public interest. In essence what Chambers is required to show at this stage is the converse of what the Township was required to demonstrate at the preliminary injunction hearing; namely, that without the requested relief, the Township would suffer immediate and irreparable harm. To this end we must again look to the record before the trial court to determine what, if any, harm would inure to the Township if the injunction is denied.

A review of the record reveals that the only evidence offered by the Township of potential harm was directed solely towards the reduction of the useful life of the landfill from approximately 38 years to 20 years. Since the operation of this landfill is a private concern Chambers' accelerated dissipation of its principal asset, the land, is not an assertable claim of the Township. Nothing more was offered by the Township. Absent from the record was testimony that the increase in operations by Chambers would either adversely affect the surrounding neighbors in the enjoyment of their property or that traffic congestion would increase due to the additional trucks using the site. At no time was it demonstrated to the court that the increased activity would adversely affect the health, safety or welfare of the community.

We are therefore constrained to hold that, given the Township's lack of evidence, Chambers has met the final two prongs of *Process Gas.*

Accordingly, we affirm the entry of the stay by the Commonwealth Court.

Order affirmed.

ZAPPALA, J., did not participate in the consideration or decision of this case.

PAPADAKOS, J., dissents. He would not have accepted plenary jurisdiction of this matter.