Dipal Corporation,                :
            Appellant     :
                         :  No.  551 C.D. 2020
           v.            :
                         :  Argued:  May 10, 2021
Chartiers Township Zoning Hearing :
Board                     :

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE J. ANDREW CROMPTON, Judge

OPINION BY
JUDGE McCULLOUGH                    FILED:  August 6, 2021

Dipal Corporation (Dipal) appeals the May 22, 2020 order of the Court of Common Pleas of Washington County (trial court), which affirmed the decision of the Chartiers Township Zoning Hearing Board (Zoning Hearing Board or Board) to deny Dipal's appeal of a Zoning Officer's determination regarding its use of land, and to deny Dipal's application for expansion of a nonconforming use.  We reverse and remand.

## Background

Dipal is the lessee of the premises located at 2440 West Pike Street, Houston, Washington County, Pennsylvania.  (Trial Court Pa.R.A.P. 1925(a) Opinion, 9/25/2020 (Trial Ct. Op.), at 1.)  The subject property contains a single one-story building, within which Dipal operates two separate businesses.  The Quick Stop Food Mart is a convenience store located on one side of the building, and the other side

houses Gabby's Black and Gold bar/restaurant. (Quick Stop and Gabby's, respectively). *Id.* at 1-2. When Dipal began operating the businesses, the property was zoned "C-1," allowing commercial uses, but the area has since been rezoned as "R-2," a residential designation. Because Dipal's use predated the zoning change, however, it is undisputed that Quick Stop lawfully operates as a nonconforming use.[1] *Id.* at 2.

Dipal wished to expand Quick Stop's business to include the sale of beer and wine, and it accordingly sought and received approval from the Pennsylvania Liquor Control Board (PLCB) to sell beer and wine at Quick Stop under the same liquor license that it uses for Gabby's. *Id.* However, a condition of that approval was that Dipal add seating for at least 30 people within the convenience store. *Id.* When Dipal added seating to the interior of the convenience store, a Zoning Officer was notified about, and subsequently investigated, the change to Quick Stop's layout. On May 24, 2019, the Zoning Officer sent a letter notifying Dipal that, by adding seating inside Quick Stop, Dipal had improperly expanded the nonconforming use of the property. *Id.*

---

[1] "A lawful nonconforming use is a use that predates the enactment of a prohibitory zoning restriction." *Sowich v. Zoning Hearing Board of Brown Township*, 245 A.3d 1188, 1195 (Pa. Cmwlth. 2021) (citing *Hafner v. Zoning Hearing Board of Allen Township*, 974 A.2d 1204, 1210 (Pa. Cmwlth. 2009)); *see also* Chartiers Township Zoning Ordinance (Zoning Ordinance) §350-16 (2019) (defining "nonconforming use" as "[a] use, whether of land or of [a] structure, which does not comply with the applicable use provisions in this chapter or amendment heretofore or hereafter enacted, where such use was lawfully in existence prior to the enactment of this chapter or amendment or prior to the application of this chapter or amendment to its location by reason of annexation").

Dipal filed an appeal[2] from the Zoning Officer's interpretation and applied for an expansion of Quick Stop's nonconforming use.[3]  The Board held an evidentiary hearing on August 19, 2019.  Dipal's owner, Sujay Patel, testified on behalf of Dipal.  *Id.* at 3.  Patel explained that Quick Stop has had a kitchen for about 12 years, but Dipal had just added seating because it wished to sell beer in the convenience store, and needed to comply with PLCB's requirements.  *Id.*  Patel testified that the liquor license in question was an expansion of Gabby's license, such that Dipal could use the same license for Gabby's and Quick Stop, provided that Quick Stop had sufficient seating for 30 people.  *Id.*  Patel further explained that Dipal did not intend to serve alcohol for consumption inside Quick Stop while customers sit and eat, and that the seating requirement is "strictly for selling purposes only."  *Id.* (quoting Zoning Hearing Transcript, 8/19/2019 (Hr'g Tr.), at 10; Reproduced Record (R.R.) at 10a).  Patel expressed some uncertainty whether, as a legal matter, the addition of the seating area would constitute an accessory use or the expansion of the existing nonconforming use, but placed particular emphasis upon the fact that Quick Stop already had a kitchen.  Patel stated:  "If I was adding a kitchen, I understand that would become an eating establishment, but the kitchen has been there since I moved in in 2006."  *Id.* (quoting Hr'g Tr. at 18).

---

[2] Pursuant to the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§10101-11202, Zoning Ordinance §350-62(H) provides the Zoning Hearing Board with jurisdiction to hear and render adjudications of "[a]ppeals from the Zoning Officer's determination under [s]ection 916.2 of the MPC, [added by the Act of December 21, 1988, P.L. 1329, 53 P.S. §10916.2,] entitled 'Procedure to obtain preliminary opinion.'"  Zoning Ordinance §350-62(H).

[3] Zoning Ordinance §350-58(B) provides for the "[n]atural and reasonable expansion of nonconforming uses" upon the filing of "an application with the Zoning Officer who shall thereupon set the matter for a hearing before the Zoning Hearing Board."  Zoning Ordinance §350-58(B).

Adam J. McGurk, the Planning Director and Zoning Officer, acknowledged that a 2013 amendment to the Zoning Ordinance allowed for an eating establishment as an accessory use. *Id.* at 4 (citing Hr'g Tr. at 15). Regardless, McGurk explained that the Township's interpretation was that, "by adding a seating area in [Quick Stop], you're adding a use that's not permitted and you're expanding a use that's not allowed to expand." *Id.* (quoting Hr'g Tr. at 19). The Board additionally took comments from members of the public, who generally spoke in opposition to Dipal's Application. (Hr'g Tr. at 27-41; R.R. at 27a-41a.) However, the individuals' concerns primarily were directed toward existing complaints about Gabby's rather than Quick Stop, such as the sound of the bar's air conditioning unit, its production of garbage, and the behavior of its customers. The Board accordingly did not consider the public comments in its decision. (Board Finding of Facts ¶8; R.R. at 53a ("Several individuals appeared to oppose the Application[;] however, testimony from those in opposition stemmed from the operation of a bar or tavern adjoining the convenience store and was not considered relevant by the Board.").)

After hearing the testimony, the Board voted 4-0 to deny both Dipal's appeal of the Zoning Officer's interpretation and its request for expansion of Quick Stop's nonconforming use. The Board rendered the following conclusions of law:

> 1. The operation of a convenience store on the subject property operates as a non[]conforming use in the R-2 Zoning District.
>
> 2. Evidence offered at the Hearing, established that the operation of an eating establishment within the convenience store is an improper expansion of the non[]conforming use.
>
> 3. [Patel] indicated that the purpose of establishing the eating area within the convenience store was to allow compliance with [PLCB] regulations to allow six (6) packs and twelve (12) packs of beer to be sold "to go."

4

> 4. The Zoning Hearing Board finds that [Dipal] has failed to meet [Zoning Ordinance §]350-58 in that the proposed use of an eating establishment and seating area within the convenience store is not a "natural and reasonable expansion" of an existing non[]conforming use.

(Board Conclusions of Law ¶¶1-4; R.R. at 53a-54a.)

Dipal appealed to the trial court on September 18, 2019.[4] The trial court ascertained the primary legal issue to be whether the addition of seating inside Quick Stop was a "natural and reasonable expansion" of the existing nonconforming use, as Dipal argued, or whether it constituted the addition of a completely new use, as the Board found. Dipal emphasized that, under Pennsylvania law, a nonconforming use creates a vested property interest, to which there attaches a constitutional right to natural expansion. (Trial Ct. Op. at 7 (citing *Chartiers Township v. William H. Martin, Inc.*, 542 A.2d 985 (Pa. 1988)).) The trial court acknowledged our Supreme Court's holding that, once a nonconforming use is established, an "overly technical assessment of that use cannot be utilized to stunt its natural development and growth." *Id.* at 7-8 (quoting *William H. Martin*, 542 A.2d at 988). The Board did not dispute the existence of a constitutional right to natural expansion of the nonconforming use, but maintained that the addition of a seating area inside Quick Stop did not constitute such an expansion, but rather amounted to the addition of a new and different use. In support of that view, the Board cited the "possibility of increased patron activity, longer stays by individuals, increased parking requirements, and increased congestion at the site." *Id.* at 8.

---

[4] The Township of Chartiers intervened in the proceedings before the trial court, and has filed a brief before this Court in support of the trial court's decision. Because the Township's brief merely joins the argument of the Board, we will not discuss it separately.

The trial court noted that the applicable ordinance provides, in relevant part:

> Natural and reasonable expansion of nonconforming uses may be permitted by the Zoning Hearing Board after a hearing under these conditions:
>
> > A.  Expansion shall not exceed the applicable dimensional space, lot area, design, structural or aesthetic restriction as set forth in this chapter.
> >
> > B.  The owner or operator, etc., desiring such expansion shall file an application with the Zoning Officer who shall thereupon set the matter for hearing before the Zoning Hearing Board.

*Id.* at 6 (quoting Zoning Ordinance §350-58). The trial court further quoted the Board's brief for the definitions of "convenience store" and "eating establishment without drive through."[5] A "convenience store," the trial court related, is defined as: "An establishment primarily engaged in the provision of frequently or recurrently needed goods for household consumption, such as prepackaged food and beverages, and limited household supplies and hardware. Typical uses include neighborhood markets and country stores." *Id.* at 6-7. An "eating establishment without drive through," the trial court stated, is: "An establishment where the principal business is the sale of food and beverages to the public in a ready-to-consume state, where the food preparation is completed in the on-site kitchen and the food is primarily consumed on-site." *Id.* at 7.

---

[5] Although both the trial court and the parties rely upon these definitions, no citation to a specific Zoning Ordinance is provided in the trial court's opinion or the parties' briefs. At the hearing before the Board, McGurk stated that "[t]he definition of 'convenience store' that exists today is adopted as part of Ordinance No. 371, which was adopted last year by the Board of Supervisors." (Hr'g Tr. at 8; R.R. at 8a.) Our research has not uncovered this definition. Nonetheless, because all parties appear to agree upon the definitions of "convenience store" and "eating establishment without drive through," we will not question them despite the absence of citation.

6

The trial court reasoned that, in order to constitute a continuation of an existing nonconforming use, a proposed use must be "sufficiently similar" to the nonconforming use and not constitute a "new" use. *Id.* at 9 (citing *Limley v. Zoning Hearing Board*, 625 A.2d 54 (Pa. 1993)). The trial court noted that Patel testified about Dipal's intent to use the existing kitchen at Quick Stop to prepare "hot sandwiches, pizza and burgers and . . . ordinary stuff." *Id.* at 9-10 (quoting Hr'g Tr. at 13). Because this contemplated the preparation of food on-site for customers to consume on-site, the trial court reasoned that the Board "reasonably could conclude that said food preparation constituted an eating establishment," because "the chief activity of a convenience store is to provide frequently needed goods for *household* consumption (*i.e.*[,] to go) and the chief activity of an eating establishment is the *on-site* preparation and consumption of food and beverage." *Id.* at 10 (emphasis in original). That distinction, in the trial court's view, was "sufficient to support [the Board's] conclusion that this would not qualify as a natural and reasonable expansion" of the existing nonconforming use. *Id.*

In support, the trial court cited the propositions that the right to expand does not include the right to add a second nonconforming use, and that a municipality has the right to impose reasonable restrictions upon such expansion. *Id.* (citing *Daley v. Zoning Hearing Board of Haverford Township*, 461 A.2d 347 (Pa. Cmwlth. 1983); *Silver v. Zoning Hearing Board of Adjustment*, 255 A.2d 506 (Pa. 1969)). The trial court added that a zoning hearing board's interpretation of its own zoning ordinance is entitled to "great deference and weight." *Id.* (citing *Risker v. Smith Township Zoning Hearing Board*, 886 A.2d 727 (Pa. Cmwlth. 2005)). Finally, the trial court opined that Patel had not provided evidence to demonstrate that the creation of a seating area within Quick Stop constituted a natural and reasonable extension of the existing

nonconforming use. Thus, the trial court concluded that the Board did not abuse its discretion or commit an error of law in denying Dipal's appeal and application.

Dipal appealed the trial court's order to this Court.[6] Dipal raises four issues. First, Dipal contends that, because Quick Stop and Gabby's are located within the same building, and because the use of that building for an eating establishment is already a lawful nonconforming use by virtue of Gabby's, the Board erred in concluding that adding seating for customers within the building constituted a new use. Second, Dipal argues that the addition of seating inside Quick Stop, thereby allowing it to use its license to sell alcohol, is a "natural and reasonable expansion" of its nonconforming use, which would not alter Quick Stop's chief purpose as a convenience store or otherwise change it into an eating establishment. Third, Dipal suggests that the Board's decision reflected an abuse of discretion because it was not supported by substantial evidence. Fourth, and finally, Dipal argues that, in light of the PLCB requirements concerning seating for customers, the Board's reasoning altogether precludes convenience stores from selling alcohol, and thus interferes with Dipal's use of its liquor license.

**Arguments**

Dipal's first argument, which depends upon its simultaneous operation of both Quick Stop and Gabby's, is essentially definitional. Dipal notes that the Zoning Ordinance refers to nonconforming uses "located either *within a building or other structure*, or part thereof," and that such uses "may be continued so long as they remain

---

[6] "Where, as here, the trial court hears no additional evidence, our review is limited to a determination of whether the board committed an error of law or an abuse of discretion." *Domeisen v. Zoning Hearing Board of O'Hara Township*, 814 A.2d 851, 855 n.3 (Pa. Cmwlth. 2003) (citing *Society Created to Reduce Urban Blight v. Zoning Board of Adjustment*, 804 A.2d 116 (Pa. Cmwlth. 2002)). "A zoning hearing board abuses its discretion when its factual findings are unsupported by substantial evidence." *Id.* (citing *Valley View Civic Association v. Zoning Board of Adjustment*, 462 A.2d 637 (Pa. 1983)).

8

otherwise lawful." (Dipal's Br. at 19 (quoting Zoning Ordinance §350-53) (emphasis added).) A "building," Dipal notes, is defined as a "structure having a roof supported by columns or walls, for the housing or enclosure of persons, animals or chattels," and buildings may be "detached," "semidetached," or "attached," depending upon whether it has zero, one, or two walls in common with another such structure. *Id.* at 19-20 (quoting Zoning Ordinance §350-16). Dipal argues that, because Quick Stop and Gabby's "have [three] walls and a roof in common," both businesses operate within the same "building," and, thus, any nonconforming use taking place within Gabby's necessarily is permissible within Quick Stop. *Id.* at 21. Because the nonconforming use of Gabby's includes the sale of food and alcohol for on-site consumption, and the provision of seating therefor, Dipal argues that Quick Stop—a tenant of the same "building" for purposes of the Zoning Ordinance—is authorized to engage in the same nonconforming use.

Next, Dipal invokes the doctrine of natural expansion. "[T]he doctrine of natural expansion . . . permits a landowner to develop or expand a business as a matter of right notwithstanding its status as a nonconforming use." *Id.* at 24 (quoting *Pappas v. Zoning Board of Adjustment of City of Philadelphia*, 589 A.2d 675, 677 (Pa. 1991)). Dipal stresses our Supreme Court's instruction that an "overly technical assessment" of a nonconforming use must not be utilized to "stunt its natural development and growth." *Id.* (quoting *William H. Martin*, 542 A.2d at 988). Dipal further quotes our Supreme Court's explanation that the doctrine of natural expansion encompasses a constitutionally protected right to "expand as required to maintain economic viability or to take advantage of increases in trade," and that a zoning ordinance cannot limit a nonconforming use to "the precise magnitude . . . which existed at the date of the

9

ordinance." *Id.* at 29 (quoting *Nettleton v. Zoning Board of Adjustment of City of Pittsburgh*, 828 A.2d 1033, 1037 n.3 (Pa. 2003)).

Here, Dipal notes that recent changes in Pennsylvania law have allowed convenience stores such as Quick Stop to sell beer and wine, and it seeks to take advantage of the expanded trade opportunities. The inability to do so, Dipal suggests, leaves Quick Stop disadvantaged against its primary competitors—Sheetz and GetGo—both of which, Dipal argues, are apparently able to add small eating areas to enable the sale of alcohol without changing their statuses to "eating establishments." *Id.* at 29-30. Along these lines, Dipal emphasizes that the definitions of "convenience store" and "eating establishment without drive through" refer to the "principal business" or the business in which the entity is "primarily engaged." *Id.* at 26, 29. Dipal maintains that there was no evidence to suggest that the addition of seating inside Quick Stop would serve to alter its *primary* business, which would remain the sale of food and beverage for household consumption. Dipal emphasizes Patel's testimony that the seating area would have virtually no effect on the current use of the store, and it notes that there was no evidence to the contrary. *Id.* at 26. The seating area, Dipal asserts, "is not intended to transform the convenience store into a dine-in restaurant," but, rather, is intended merely to allow Dipal "to sell beer and wine to go as well as utilize the preexisting kitchen to sell prepared deli items for on-site consumption." *Id.* at 27. Because Quick Stop already has a kitchen and sells food and beverages, Dipal maintains that the addition of the seating area does not reflect a new and different use, but rather the mere growth of Quick Stop's existing business, and thus a natural and reasonable expansion of its nonconforming use.

Further, Dipal argues that the Board abused its discretion because its decision was not supported by substantial evidence. Dipal primarily stresses an

10

exchange at the hearing between the Zoning Officer, McGurk, and Solicitor Thomas A. Lonich, Esq., in which McGurk stated that he did not have an opinion as to whether the seating area constituted a natural and reasonable expansion of Quick Stop's nonconforming use. *Id.* at 34-35. Dipal additionally emphasizes that the testimony of the members of the public concerned the operation of Gabby's, not Quick Stop, and the Board expressly declined to rely upon any such testimony. *Id.* at 37. Absent the public comments, however, Dipal argues that there was no evidence to support the Board's concerns about increased congestion or parking difficulties, and that such concerns were derived solely from the Board members' speculation. *Id.* at 37-38. Regardless, Dipal contends, such concerns would not preclude a finding of a natural and reasonable expansion, even if supported by the record.

Finally, Dipal suggests that the Board's decision "unreasonably interferes" with Dipal's use of its liquor license. *Id.* at 41. Dipal cites the preemption doctrine, pursuant to which "local legislation cannot permit what a state statute or regulation forbids or prohibit what state enactments allow." *Id.* (quoting *Huntley & Huntley v. Borough Council of the Borough of Oakmont*, 964 A.2d 855, 862 (Pa. 2009)). Dipal posits that the Board's decision suggests that a convenience store cannot add a seating area without changing its classification to an eating establishment, which, *ipso facto*, would mean that convenience stores are categorically prohibited from selling beer and wine, even though the PLCB permits such sales within convenience stores. *Id.* at 41-42. Dipal again invokes its need to keep up with its competition to remain economically viable, and it suggests that the Board has improperly sought to regulate the conduct of its business.

The Board first notes that, to the extent that Dipal suggests that the Board bore the burden of proof, it was Dipal that applied for an expansion of its

nonconforming use. There was no citation issued to Dipal, and the letter it received merely contained "courtesy information" concerning Dipal's right to bring the issue before the Board. (Board's Br. at 3.) The Board argues that the burden of proof was on Dipal, because the "burden of proving the extent or existence of a nonconforming use rests upon the property owner [that] would claim the benefit of the rights accorded the property with that status." *Id.* at 10 (quoting *Overstreet v. Zoning Hearing Board of Schuylkill Township*, 412 A.2d 169, 171-72 (Pa. Cmwlth. 1980)).

As to the merits of Dipal's position, the Board's argument is straightforward. The Board emphasizes that, despite Dipal's common ownership, Quick Stop and Gabby's are two wholly separate entities that engage in two separate nonconforming uses, albeit in the same building. *Id.* at 4-5. Because Quick Stop did not previously allow for on-site consumption of the food that it sells, the Board contends that the addition of a seating area "is a new and different use from that of a convenience store." *Id.* at 8. In support, the Board echoes the trial court's citation of *Daley* and *Silver* for the propositions that natural expansion does not encompass a right to add a second nonconforming use, and that a municipality has a right to impose reasonable restrictions upon the expansion of nonconforming uses. *Id.* at 9 (citing *Silver*; *Daley*); *see also* Trial Ct. Op. at 10.

The Board reiterates concerns regarding the possibility of "increased patron activity," "longer stays by individuals," "increased parking requirements," and "increased congestion at the site." (Board's Br. at 8.) These concerns ostensibly derive from the Board's view that the addition of a seating area inside Quick Stop will transform Quick Stop into an "eating establishment." The Board emphasizes Patel's testimony that Quick Stop intends to sell hot sandwiches, pizza, and burgers. *Id.* at 9. Because the "proposed expansion will prepare food on[-]site to be consumed by

12

patrons on[-]site," the Board suggests that "[t]his is a defined eating establishment." *Id.* The "chief activity" of a convenience store, the Board stresses, is the sale of goods for "household consumption." *Id.* The "chief activity" of an eating establishment is the "on[-]site preparation and on[-]site consumption of food and beverage." *Id.* The latter, the Board argues, does not constitute a natural and reasonable expansion of the former.

With regard to Dipal's definitional argument concerning nonconforming uses operating within the same "building," the Board compares the situation to a "strip mall," in which a single structure houses multiple tenants. *Id.* at 4. The suggestion is that it would be improper for one tenant of the strip mall to adopt a new and distinct nonconforming use simply because another tenant somewhere else in the strip mall engages in such use. To the extent that Dipal contends that the Board's decision was not supported by substantial evidence, the Board suggests that it was Dipal that "failed to submit any evidence why a [30-]patron sit down eating area was a natural and reasonable extension of the existing non[]conforming use." *Id.* at 11. Finally, with regard to the asserted interference with Dipal's use of its liquor license, the Board asserts that there is nothing in the record to show what information was provided to the PLCB in connection with the license, that the Board is unaware of the category of license that was provided or any other restrictions placed upon the license, and that the license was never produced or presented to the Board. *Id.*

**Discussion**

At the outset, to the extent that the parties differ with regard to the assignment of the burden of proof, we agree with the Board that the burden fell upon Dipal. There is no indication that Dipal was subject to a zoning enforcement

13

proceeding,[7] and it was Dipal that appealed the Zoning Officer's interpretation and applied for an expansion of Quick Stop's nonconforming use. "[W]e have held that a property owner seeking to expand its nonconforming use bears the burden to prove the existence of a prior nonconforming use by showing an actual use that was created in good faith and that previously existed lawfully." *Harrisburg Gardens, Inc. v. Susquehanna Township Zoning Hearing Board*, 981 A.2d 405, 413 n.5 (Pa. Cmwlth. 2009) (citing *McGeehan v. Zoning Hearing Board of Springfield Township*, 407 A.2d 56, 58 (Pa. Cmwlth. 1979)). That it bore the burden is by no means fatal to Dipal's appeal, because the Board's decision, if it is to stand, must have been supported by substantial evidence, and must not have reflected an erroneous application of the law.

Contrary to the Board's argument to this Court, and contrary to the trial court's opinion, we find that Dipal did indeed present evidence to support its position that the addition of the seating area inside Quick Stop was a natural and reasonable expansion of its existing nonconforming use. Moreover, the record is devoid of evidence to the contrary. The record further fails to support the Board's concerns regarding increased patron activity, increased parking requirements and the like, and, regardless, these grievances would pose no discernable obstacle under the governing precedent. Before examining the record, however, it is worthwhile to review the general contours of the doctrine of natural expansion.

Our Supreme Court articulated the doctrine of natural expansion nearly a century ago,[8] and Pennsylvania courts consistently have applied the doctrine ever since.

---

[7] *See* section 617.2 of the MPC, added by section 62 of the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10617.2 (concerning enforcement remedies).

[8] *See In re Gilfillan's Permit*, 140 A. 136, 137-38 (Pa. 1927) ("Petitioner's business had been established at its present location long before the passing of the zoning ordinance and was actively conducted at the time the ordinance went into effect; accordingly, as the property was then used for **(Footnote continued on next page…)**

14

The inquiry, however, is sometimes framed in terms of "continuation" of a nonconforming use, which nonetheless necessitates consideration of the doctrine of natural expansion. *See Limley*, 625 A.2d at 56 ("In determining what is a proper continuation of a nonconforming use, to wit, whether a proposed use bears adequate similarity to an existing nonconforming use, the doctrine of natural expansion must be given effect."). "The rationale behind the doctrine can be traced to the due process requirements protecting private property. If a person owns property which constitutes a valid non[]conforming use, it is inequitable to prevent him from expanding the property as the dictates of business or modernization require." *Silver*, 255 A.2d at 507 (footnote omitted). Although the doctrine earlier had been characterized with constitutional overtones, it was in *Silver* that our Supreme Court clarified that "the right of natural expansion is a constitutional right protected by the due process clause." *Id.*

The doctrine of natural expansion may be invoked "to maintain economic viability or to take advantage of increases in trade." *Nettleton*, 828 A.2d at 1037 n.3. It further may allow for an increase in the "magnitude" or "intensity" of a nonconforming use. *Limley*, 625 A.2d at 57 ("The doctrine of natural expansion would . . . support increased intensity in the property's utilization."); *Humphreys v. Stuart Realty Corporation*, 73 A.2d 407, 409 (Pa. 1950) ("[A] nonconforming use cannot be limited by a zoning ordinance to the precise magnitude thereof which existed at the date of the ordinance; it may be increased in extent by natural expansion and growth of trade . . . ."). The doctrine permits even a "change in instrumentality" of a nonconforming use. *William H. Martin*, 542 A.2d at 988; *see also Firth v. Scherzberg*,

lawful purposes, the city was without power to compel a change in the nature of the use, or prevent the owner from making such necessary additions to the existing structure as were needed to provide for its natural expansion and the accommodation of increased trade, so long as such additions would not be detrimental to the public welfare, safety and health.").

15

77 A.2d 443, 446 (Pa. 1951) ("Neither the natural growth of a business, existing at the time of the enactment of a zoning ordinance, nor adoption thereafter of more modern instrumentalities, suitable and helpful in carrying on the business, works a change of use in legal contemplation."). Our Supreme Court has applied the doctrine, for example, to allow a private club to expand into a public restaurant and bar, *Limley*, 625 A.2d at 56-57, to allow a takeout sandwich shop to expand into a full-service pizza restaurant, *Pappas*, 589 A.2d at 677-78, to allow a landfill to increase its daily intake of waste, *William H. Martin*, 542 A.2d at 988-90, and to invalidate a zoning provision prohibiting any increase in the number of dwelling units in an apartment building, *Silver*, 255 A.2d at 507-08.

Naturally, not all uses fall within the doctrine, and not all restrictions upon nonconforming uses are forbidden. As the Board emphasizes, to receive the benefit of the doctrine, "a proposed use must be sufficiently similar to the nonconforming use as not to constitute a new or different use." *Limley*, 625 A.2d at 55.[9] Moreover, our Supreme Court has "never questioned the right of a municipality to impose reasonable restrictions on the expansion of a non[]conforming use." *Silver*, 255 A.2d at 507. Such "reasonable restrictions" place a limitation on the doctrine, that "[t]he contemplated expansion must not be detrimental to the public health, welfare and safety." *Id.*

With these principles in mind, we return to the record in the instant case. Both the Board and the trial court insist that Dipal failed to produce any evidence to suggest that the addition of the seating area within Quick Stop constituted a natural and

_____

[9] As to the question of whether a use is "new or different," however, our Supreme Court stressed that "[t]he proposed use need not . . . be identical to the existing use; rather, similarity in use is all that is required." *Limley*, 625 A.2d at 55 (citing *Pappas*, 589 A.2d at 677-78). Further, in considering such similarities and differences, our Supreme Court has instructed that, "once it has been determined that a nonconforming use is in existence, an overly technical assessment of that use cannot be utilized to stunt its natural development and growth." *William H. Martin*, 542 A.2d at 988; *see also Pappas*, 589 A.2d at 677.

16

reasonable expansion of its nonconforming use. (Board's Br. at 11; Trial Ct. Op. at 10.) We disagree.

Patel explained the basis for Dipal's application to expand Quick Stop's existing nonconforming use:

> Mr. Patel: . . . We applied for the application because we have a kitchen in the convenience store, we have had it since – about 12 years, but we just added seating because we wanted to get a license to sell six-packs and twelve-packs for the convenience store now that the State of Pennsylvania started giving those licenses to convenience stores on one condition, that you would have to have 30-person seating, so we just added that.

(Hr'g Tr. at 9.) Patel further spoke to Quick Stop's need to expand its inventory to include alcohol in order to remain competitive within its industry:

> [Board Member] Amato: Do you think this will be pretty feasible?
>
> Mr. Patel: I hope so. You know, Sheetz is coming and it's very close, and they're going to have six and twelve-packs, also, selling, as well. And we think that – you know, the bar already sells six-packs and twelve-packs to go, but it might be more convenient for our patrons/customers to get it from the store side rather than going in the bar.

*Id.* at 13.

With regard to the existing use and internal layout of Quick Stop, Patel testified: "We are not changing any square footage of the building, nor are we changing the square footage of the convenience store nor the bar itself." *Id.* at 10.[10] Moreover,

---

[10] *See* Zoning Ordinance §350-58(A) ("Expansion shall not exceed the applicable dimensional space, lot area, design, structural or aesthetic restriction as set forth in this chapter.").

17

Patel explained that accommodation of the seating area did not require Quick Stop to make any changes to the inventory of products that it currently sells:

> [Board Member] Mariani:  Did you have to take away items that you're selling to make space?
>
> Mr. Patel:  No, we did not.  We just did some moving of shelving around.  We actually put seating right in front of the kitchen so, you know, it would be convenient for our customers to just get the prepared food right from the kitchen.

*Id.* at 23-24.  Patel additionally testified that the intent of the seating area was not to serve alcohol tableside; rather, "[i]t will be just for selling six-packs and twelve-packs to go only." *Id.* at 10.

Quick Stop's kitchen was a significant focus of the testimony.  Patel testified that Quick Stop has its own kitchen, and that it had been there for 12 years. *Id.* at 9.  Patel acknowledged that Quick Stop's kitchen was not in service at the time of the hearing because it did not currently have a cook to operate it, but it is undisputed that Quick Stop previously prepared and served food to-go. *Id.* at 23.[11]  With regard to the existing kitchen, Patel and Solicitor Lonich had the following exchange:

> Solicitor Lonich:  The kitchen that you are referring to, was it used to provide food so the customers could eat on-site in the convenience store?
>
> Mr. Patel:  There was no seating for them to sit there.  It was going in a packaging [sic].  There was no seating, basically.

---

[11] There has been no allegation that Dipal abandoned Quick Stop's use of its kitchen to prepare and sell food to customers. *See Pappas*, 589 A.2d at 677 ("This Court has held . . . that abandonment of a nonconforming use cannot be established by mere proof of a failure for a time to use the property or of a temporary use of the property not inconsistent with an intention to use it for the original purpose.  There must be evidence of intention to abandon.").

> The kitchen was there to provide the food, but they could not sit there.
>
> Solicitor Lonich: So, again, the kitchen was not used to provide food to individuals who would then take that food, sit down in the convenience store and eat?
>
> Mr. Patel: Yes, sir. It was to-go, or to take it with them.

*Id.* at 18.

In sum, one can characterize Patel's testimony as establishing an existing nonconforming use that included the utilization of an existing kitchen to prepare and sell food to customers—a use which Dipal seeks to increase in "magnitude," *Humphreys*, 73 A.2d at 409, due to the changes in the law governing the sale of alcohol, that would allow Dipal to "take advantage of increases in trade" and "maintain economic viability" in relation to its competition. *Nettleton*, 828 A.2d at 1037 n.3. Patel further testified that Quick Stop would continue to sell all of the items that it sold previously, and that its sale of 6-packs and 12-packs would be for off-premises consumption—suggesting that Quick Stop does not intend to alter its chief purpose as a convenience store. Notably, the Board did not indicate that it found any portion of Patel's testimony lacking in credibility. Accordingly, to suggest that Dipal provided no evidence whatsoever to support the requested expansion of its nonconforming use is to take a rather cramped view of the request and the testimony.

Perhaps even more significantly, the ostensibly opposing view of the Zoning Officer, McGurk, did little to contravene Patel's position. Solicitor Lonich asked McGurk about the proposed use:

> Solicitor Lonich: Does the Zoning Office have an opinion on how the proposed use of the sit down eating area would fall into the ordinance? Do you see that as an accessory use,

19

do you see that as an expansion of a nonconforming use, or does it even really matter?

Mr. McGurk: *We do believe there is some merit as an accessory use because he is already preparing the food. It's not like he's establishing a kitchen with a seating area to prepare food. That's already happening.*

But because of the ordinance that was previously adopted addressing eating establishments as accessory use[s], we felt there was a strong case to deny adding an eating establishment as an accessory use for this situation because the ordinance, we felt, already addressed that.

Solicitor Lonich: *Did the Zoning Office of the Township provide an opinion whether his proposed use would be a reasonable expansion of a nonconforming use, or you just didn't address that?*

Mr. McGurk: *We do not have an opinion, because, to us, there are still unanswered questions.* For example, rest[]room facilities in the convenience store, I haven't inspected those and I don't believe our Building Code official has yet.

(Hr'g Tr. at 20-21 (emphasis added).) McGurk and Solicitor Lonich then clarified that the question of whether Quick Stop's restroom facilities would satisfy building code requirements was immaterial to whether, as a matter of zoning law, Quick Stop was entitled to expand its existing nonconforming use to include the seating area.

[Mr. McGurk:] I know he has had some preliminary discussions with our Building Code official about what may or may not be required for public rest[]rooms, but, to me, that's a big unknown for having a sit down area within the convenience store, things of that nature.

Solicitor Lonich: He is just looking for the use.

Mr. McGurk: Correct.

20

Solicitor Lonich: So if the use is permitted, you'd still have to comply with all Township ordinances, building codes, all of that type of thing; correct?

Mr. McGurk: Correct. I guess I'm saying I question whether that can or cannot be complied with at this point.

Solicitor Lonich: Well, that's a question for later on.

Mr. McGurk: I know. We're just talking about the use tonight.

*Id*. at 21-22.

Although the Board now takes the position that the addition of the seating area inside Quick Stop amounts to an entirely "new" and "different" use, McGurk's comments at the hearing all but conceded the requisite similarity between the existing use and the proposed use. As McGurk acknowledged, "[i]t's not like [Dipal is] establishing a kitchen with a seating area to prepare food." *Id.* at 20. "That's already happening." *Id.* Moreover, according to McGurk, the Zoning Office did "not have an opinion" about the application of the doctrine of natural expansion, and its hesitation in that regard was based upon considerations that McGurk recognized as irrelevant to the inquiry. *Id.* at 21. It is difficult to ascertain, then, upon what evidence the Board relied in concluding that "[e]vidence offered at the [h]earing, established that the operation of an eating establishment within the convenience store is an improper expansion of the non[]conforming use." (Board Conclusions of Law ¶2.)

The only other evidence offered in opposition to Dipal's application took the form of public comments that the Board received at the end of the hearing. However, as noted above, the Board expressly found the individuals' comments irrelevant because they related only to existing complaints about Gabby's. (Board Finding of Facts ¶8 ("Several individuals appeared to oppose the Application[;]

21

however, testimony from those in opposition stemmed from the operation of a bar or tavern adjoining the convenience store and was not considered relevant by the Board.").) Yet, in support of its position, the Board cites concerns with the possibility of increased patron activity, longer stays by individuals, increased parking requirements, and increased congestion. (Board's Br. at 8; Trial Ct. Op. at 8.) The only testimony that touched upon any of these concerns came from the public comments, which the Board expressly declined to consider. A question plainly arises, then, as to where in the record the Board may find support for these ostensible concerns with the expanded use of Quick Stop.

Notwithstanding the absence of support in the record for concerns over increased numbers of patrons, increased parking requirements, increased congestion, etc., these issues are not foreign to the doctrine of natural expansion. The Board cited no precedent in its conclusions of law. Had it done so, it may have recognized the decisional law relating to the permissible increases in "intensity" or "magnitude" of a nonconforming use that is entitled to natural expansion. Our Supreme Court's decision in *Limley* provides a quintessential example of such expansion, despite the existence of concerns similar to those which have been voiced in this matter.

In *Limley*, the appellant sought to open a restaurant and bar in a building that previously housed a nonprofit, private club. *Limley*, 625 A.2d at 54. The operation of the private club predated a zoning ordinance that classified the area as residential, so the private club lawfully operated as a nonconforming use. *Id.* at 55. The municipality's zoning hearing board determined, however, that the proposed restaurant and bar did not constitute a continuation of the private club's nonconforming use, but rather amounted to a new use that was prohibited by the zoning ordinance. This Court affirmed the zoning hearing board's decision, but our Supreme Court reversed,

22

concluding that, notwithstanding the public/private distinction, the "proposed use was similar to, and a natural expansion of, the food and beverage facility that constituted the existing nonconforming use." *Id.* at 56. The Supreme Court acknowledged that "a private club selling food and beverages may not be identical to a public facility engaged in the same enterprise," but under the doctrine of natural expansion, "it is not necessary that the proposed use be identical to the existing one; rather, similarity is what is required." *Id.*

Notably, the *Limley* Court recognized residents' concerns with increases in patronage and heightened parking requirements, but this did not alter the Court's view of what constituted a natural and reasonable expansion:

> Residents of the neighborhood have speculated that, if the facility were converted to public use, a great number of "strangers" might enter the area. Further, because parking problems arose on occasions when the club held events that attracted large numbers of people, residents fear that parking problems will also arise from using the property as a restaurant and bar.
>
> *The doctrine of natural expansion would, however, support increased intensity in the property's utilization.* Transforming the private club into a public facility would serve primarily to expand its patron base. Further, given that the nonconforming use is the sale of food and beverages, such use would remain the same regardless of whether patrons and their guests are neighborhood residents or outsiders.

*Id.* at 57 (emphasis added). Likewise here, even if the record supported the Board's concerns about an increased number of patrons at Quick Stop, longer stays by those patrons, increased congestion, or greater parking requirements, the "doctrine of natural expansion would . . . support increased intensity in the property's utilization." *Id.*

23

Another of our Supreme Court's precedents is worthy of discussion, given its clear resemblance to the circumstance before us. In *Pappas*, the appellant operated a sandwich shop as a nonconforming use in a building in Philadelphia, but sought to renovate the building with the intention "to expand the restaurant from a sandwich shop which served primarily take-out food to high school students to a full service pizza restaurant with seating for forty customers." *Pappas*, 589 A.2d at 676. Because the appellant's shop was not in operation for approximately three years while he performed renovations, the zoning authority concluded that the appellant had abandoned his nonconforming use. This Court found that it was error to place the burden upon the appellant to disprove abandonment of his use, but nonetheless concluded that the appellant's plan to open a full-service restaurant amounted to an abandonment of his original nonconforming use in favor of a new and different use.

The *Pappas* Court reversed, concluding not only that the appellant had not abandoned the nonconforming use over the three-year period of renovations, but also that, "[i]n determining that the restaurant proposed by [the appellant] constitutes a new and different use, the Commonwealth Court ignored the doctrine of natural expansion[,] which permits a landowner to develop or expand a business as a matter of right notwithstanding its status as a nonconforming use." *Id.* at 677. Quoting *William H. Martin*, the Court noted that "once it has been determined that a nonconforming use is in existence, an overly technical assessment of that use cannot be utilized to stunt its natural development and growth." *Id.* (quoting *William H. Martin*, 542 A.2d at 988). The Court reasoned that "the Commonwealth Court utilized *an overly technical distinction between eat-in and take-out restaurants* found in [T]he Philadelphia Code to conclude that Pappas abandoned the original use for a new and different use." *Id.* (emphasis added). The Court found no significance in the distinction found in the

24

applicable ordinance—that a take-out restaurant required a special certificate in the zoning district, but an eat-in restaurant did not. *Id.* at 677-78. Rather, the Court relied upon the general similarity of the uses and the right to expand the original nonconforming use. The record demonstrated that "the original sandwich shop/restaurant had limited counter seating and sold primarily take-out food to high school students." *Id.* at 678. The record further indicated that the appellant "intended to expand to a full service pizza restaurant with seating for forty customers and that take-out service would be limited to less than 25% of the gross floor area." *Id.* Under those facts, the Court concluded that "the change from the sandwich shop/restaurant to a full service pizza restaurant is not a change to a new and different use but, rather, the expansion of the prior nonconforming use." *Id.*

*Pappas* has clear consequences for the Board's position in this case. With regard to the doctrine of natural expansion, the Board principally relies upon the proposition that the right does not permit the addition of a "new" use. (Board's Br. at 8 (citing *Limley*).) The Board does not give any weight to the fact that the nonconforming use of Quick Stop long included Quick Stop's use of its kitchen to prepare take-out food for customers. According to the Board, by merely adding a seating area that would enable on-site consumption of food prepared in that same kitchen, Quick Stop is altering its "chief activity" from that of a "convenience store" to that of a "sit down eating establishment." *Id.* at 9. Given the absence of evidence to suggest that Quick Stop plans for its "chief activity" to become something other than the selling of food and beverage for household consumption, this assertion is questionable in its own right. Regardless, read against *Pappas*, and its allowance for the natural growth of a take-out establishment into an eat-in restaurant, it is clear that the Board's reasoning reflects "an overly technical assessment" of Quick Stop's

25

existing use, which has been "utilized to stunt its natural development and growth." *Pappas*, 589 A.2d at 677; *William H. Martin*, 542 A.2d at 988.

The only other legal proposition that the Board cites with regard to the doctrine of natural expansion is that a municipality is entitled to impose "reasonable restrictions" upon nonconforming uses. (Board's Br. at 9 (citing *Silver*).) The Board does not explain, however, why its unqualified rejection of Dipal's application was "reasonable," or how its "restrictions" should be balanced against Dipal's constitutional right to natural expansion, as identified in *Silver*. Moreover, the "reasonable restrictions" that our Supreme Court referenced in *Silver* were those limiting the expansion of a nonconforming use that would be "detrimental to the public health, welfare and safety." *Silver*, 255 A.2d at 507. The Board has made no attempt to demonstrate that the addition of a seating area inside Quick Stop would pose a threat to public health, welfare, or safety, and no such risks are apparent.

Under the doctrine of natural expansion, "it is not necessary that the proposed use be identical to the existing one; rather, similarity is what is required." *Limley*, 625 A.2d at 56. We are satisfied that Dipal's proposed use satisfied the requisites of the doctrine. We further conclude that critical portions of the Board's decision were unsupported by substantial evidence, and that the Board abused its discretion and erred as a matter of law in denying Dipal's application to expand its existing nonconforming use.[12]

Accordingly, we reverse the order of the trial court and remand for further

---

[12] In light of our disposition, we need not address Dipal's remaining arguments concerning the Zoning Ordinance's definitions or the interaction between Dipal's liquor license and the municipality's zoning authority.

26

proceedings consistent with this opinion.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dipal Corporation, :
         Appellant :
         : No. 551 C.D. 2020
      v. :
         :
Chartiers Township Zoning Hearing :
Board :

## *ORDER*

AND NOW, this 6th day of August, 2021, the order of the Court of Common Pleas of Washington County is REVERSED, and the matter is REMANDED for further proceedings consistent with the foregoing opinion.

Jurisdiction relinquished.

 

_____
PATRICIA A. McCULLOUGH, Judge