# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Plum Borough,                                    :
               Appellant          :
                             :
                             :
          v.             :   No. 1198 C.D. 2022
                             :   Argued: October 10, 2023
Zoning Hearing Board of the Borough    :
of Plum, Penneco Environmental        :
Solutions, LLC and Protect PT          :


**BEFORE:**    **HONORABLE RENÉE COHN JUBELIRER,** President Judge
                 **HONORABLE PATRICIA A. McCULLOUGH,** Judge
                 **HONORABLE CHRISTINE FIZZANO CANNON,** Judge


**OPINION BY**
**PRESIDENT JUDGE COHN JUBELIRER**      **FILED: January 29, 2024**


Appellant Plum Borough (Borough) and Intervenor Protect PT (together, Objectors) appeal from the Order of the Court of Common Pleas of Allegheny County (common pleas) affirming the decision of the Zoning Hearing Board of the Borough of Plum (ZHB), which granted Intervenor Penneco Environmental Solutions, LLC's (Penneco) application for a special exception to expand a preexisting nonconforming use (Application). After careful review, we vacate common pleas' Order and remand with instructions to further remand to the ZHB to make findings of fact and conclusions of law sufficient to grant or deny the Application and enable appellate review.

## I.  BACKGROUND

At issue in this appeal is Penneco's 69-acre property located at 1815 Old Leechburg Road within Plum Borough (property) and zoned as Rural Residential (RR) per the PLUM BOROUGH ZONING ORDINANCE, ORDINANCE NO. 916-17 (2017), as amended (Ordinance).  (ZHB Decision, Findings of Fact (FOF) ¶¶ 1-4.)  Penneco (or predecessor-in-interest Sedat, Inc.) has operated a production gas well on the property since 1989.  (*Id.* ¶ 5.)  In 2016, Penneco sought permission from the United States Environmental Protection Agency (EPA) to operate an underground injection well (also known as an Underground Injection Control well, or UIC well) on the property, the subject of this Court's decision in *In re Penneco Environmental Solutions, LLC*, 205 A.3d 401, 402 (Pa. Cmwlth. 2019).  (*See also* FOF ¶ 6.)  There, we explained that "[a]n underground injection well serves to dispose of exploration and production fluids from oil and gas operations by placing the fluids into porous geologic formations[,] . . . [which] is subject to the oversight of the [EPA]." *Penneco*, 205 A.3d at 402.  (*See also* FOF ¶¶ 7-8.)  Those fluids are also referred to as brine.  (Reproduced Record (R.R.) at 14a.)  Common pleas granted site-specific relief to Penneco as to the first proposed injection well, which was affirmed. *Penneco*, 205 A.3d at 410.[1]

---

[1] *Penneco* involved a substantive validity challenge to the Ordinance, which Penneco alleged at the time excluded injection wells and was preempted by state and federal law.  *Penneco*, 205 A.3d at 402-03.  However, before this Court, the **only** issue was whether the ZHB erred in finding the challenge **not ripe** for review, Penneco having not secured the approval of the EPA and Pennsylvania Department of Environmental Protection (DEP).  *Id.* at 403.  Our decision was limited to ripeness.  *Id.* at 410.  Because the only issue raised on appeal was ripeness, and there was **no appeal** of common pleas' **merits determination** that the then-current zoning ordinance was exclusionary, the effect of our decision was to affirm common pleas' order granting site-specific relief as to the well at issue in that litigation.  (*See* FOF ¶ 18.)

After securing the necessary approval from the EPA and the Pennsylvania Department of Environmental Protection (DEP), Penneco began operating a UIC well on the property. (FOF ¶¶ 18-19.) Specifically, it converted a well it refers to as "Sedat 3A" from a natural gas production well to an injection well. (R.R. at 17a, 164a.) In November 2021, Penneco submitted its Application, styled as a "Special Exception Application . . . for the expansion of a non[]conforming use," seeking to "add another [UIC well] and observation well to be serviced by the already[ ]existing . . . [f]acilit[ies]." (*Id.* at 155a; FOF ¶¶ 22-23.) The Application refers to the proposed injection well as "Sedat 4A." (R.R. at 17a, 164a.)

The ZHB held a hearing on the Application in January 2022. Penneco called its Chief Operating Officer Ben Wallace (Wallace), who testified that "much of the brine in Pennsylvania is exported to Ohio. So, there is [sic] millions of gallons of brine moving around the state, and there are only a few injection wells in Pennsylvania that accept these brines." (*Id.* at 15a.) Wallace further explained that Penneco's "customers could easily deliver us more fluid. We are constrained by our ability to receive fluid" and "have our customers currently rationed on the amount of fluid that they can bring us on a daily basis." (*Id.* at 22a.) He also testified that Penneco would benefit from having both wells be UIC wells. (*Id.* at 25a.) That is because, in part, Penneco could service customers more effectively if it could "operate either well in the event that either well is being serviced," which he referred to as creating an important "redundancy" in its UIC well operations. (*Id*.) Wallace also indicated no new roads would be required, but the pipeline would have to be replaced with a new injection pipeline. (*Id.* at 18a.) He further testified that the EPA application for the proposed injection well was administratively complete, and he expected the EPA to schedule hearings on that application within six months. (*Id.*

3

at 26a.)  He explained that bringing the proposed injection well online would increase its capacity by 50%, from the then-30 loads to 45 loads per day.  (*Id.*)  Wallace also confirmed there would be no additional noise from the injection well itself, but an increase in truck traffic could increase the noise level.  (*Id.* at 27a-28a.)

Protect PT called witnesses to testify about their concerns regarding Penneco's current operations and the contemplated expansion thereof.  One community member testified that she has had issues with air quality and water quality since July 2021, for which she requested a report from Duquesne University and filed a complaint with DEP.  (*Id.* at 62a.)  She indicated she filed a complaint with the Borough related to water, air quality control, and truck traffic, with Allegheny County related to air quality, and with the state police related to truck traffic.  (*Id.* at 62a-63a.)  She testified further that since the injection well began operating, truck traffic has increased, sometimes a truck every 30 minutes in the middle of the night.  (*Id.* at 63a.)  Moreover, she testified to "a chemical odor in the air that has caused headaches."  (*Id.*)  Generally, she indicated that she is "just concerned for [her] health, for [her] family's health, [and] for the community's health."  (*Id.* at 64a.)

Two other residents who live on the same road as the property testified.  One indicated concerns about his property becoming "swampy," and truck traffic "com[ing] up and down that road 24 hours a day."  (*Id.* at 110a-11a.)  Another community member indicated that "we have had some very bad acid odors that will make your eyes water, [create a] bad taste in your mouth.  We actually had to leave at times[] because it is so bad."  (*Id.* at 111a.)  He also testified about his concerns regarding light and noise from the property, as well as truck traffic.  (*Id.* at 111a-12a.)

4

Another resident testified as to his concerns with residential properties being within 500 feet of the property. (*Id.* at 114a.) Yet another resident testified to the "mental anguish" resulting from the increased truck traffic and lost sleep. (*Id.* at 115a.) Another community member testified that, at one point, his water began tasting like mold. (*Id.* at 67a.) He explained that he called Penneco's president for help, who brought water and ultimately made arrangements for "water buffaloes" to supply water. (*Id.* at 67a-68a.) He said that in "40 years of drinking water from that spigot, [he] never had an issue prior to them working across the street." (*Id.* at 69a.) He also expressed a concern about the increased truck traffic. (*Id.*)

Finally, Protect PT called registered nurse Laura Dagley who serves as "medical advocacy coordinator for Physicians for Social Responsibility."[2] (*Id.* at 77a.) She testified that she had "reviewed dozens of studies, health studies, as well as EPA and DEP documents and studies, just over the course of [her] working years and in preparation for this." (*Id.* at 78a.) She testified about the relationship between air quality and health, (*id.* at 84a), and chemicals from fracking and their negative health impacts, (*id.* at 85a), as well as chemicals present in fracking wastewater that might cause health problems, (*id.* at 87a-92a).

The Borough called Tysen Miller, who had served as Borough engineer for the past 30 years. (*Id.* at 116a.) He testified that the proposed UIC well is approximately 325 feet away from the nearest property line, and approximately 430 feet from the nearest existing structure. (*Id.* at 117a.)

At the end of the hearing, Timothy Joyce, a member of the ZHB, commented that

---

[2] Penneco objected to qualifying Dagley as an expert after a brief voir dire as to her qualifications. (R.R. at 80a-83a.) The ZHB took the objection under advisement, permitted her to testify, and did not ultimately rule on the objection. (*Id.* at 83a.)

5

no matter what we rule tonight as a local [ZHB], it doesn't matter. This was a formality. . . . So, I am going to make a motion to vote yes on the motion [to approve the Application], because to do otherwise would be a waste of money to the taxpayers of Plum Borough and to the manpower of Plum Borough, because we would be turned over in court anyway.

(*Id.* at 120a-21a.)

Another ZHB member, Andy Zarroli, stated, "we can't stop this, we can't regulate it, and we can't prevent this expansion," echoing Joyce's characterization of the proceeding as "a formality that Penneco has to go through." (*Id.* at 122a.)

Finally, Michelle Chapkis, chairperson of the ZHB, explained to those in attendance that "we have been informed that this is not a special exception . . . [so] all the various elements in the [O]rdinance, and in Section 403 [of the Ordinance, ORDINANCE, § 403,] under special exception, that, indeed, is not applicable this evening." (*Id.* at 124a.) The ZHB then voted to approve Penneco's Application. (*Id.* at 126a-27a.)

The ZHB issued a written decision. In its findings of fact, the ZHB found that Penneco presented evidence that the new injection point and observation well would require no new roads and no new construction, as the footprint of its operation would not change, and the necessary changes would occur underground. (FOF ¶¶ 25-26, 29.) Further, it found that Penneco predicted that truck traffic to its property would increase from 30 to 45 loads per day, and that its product capacity would increase by 50% as a result of the proposed expansion. (*Id.* ¶¶ 27-28.) The ZHB explained that such use qualifies as "a preexisting nonconforming use because . . . [it] commenced prior to the adoption of the current Ordinance." (*Id.* ¶ 20.)[3]

---

[3] The Borough adopted its current Ordinance regulating injection wells on December 11, 2017. (Original Record (O.R.) Item 10.) Penneco applied to convert the first injection in March 2016, well prior to the Ordinance's adoption. *Penneco*, 205 A.3d at 403.

The ZHB observed that the Ordinance, consistent with Pennsylvania law, gives landowners the right to apply to expand preexisting nonconforming uses made "necessary by the natural expansion and growth of trade." (*Id.* ¶¶ 32-33 (quoting Section 1002(C) of the Ordinance, ORDINANCE, § 1002(C)).) Subsection C of Section 1002 of the Ordinance is entitled "Expansion or extension of nonconforming use," and provides in relevant part:

> No . . . nonconforming use shall be enlarged or increased or extended to occupy a greater lot area than was occupied at the effective date of adoption or amendment of this Ordinance, unless the ZHB shall interpret that the enlargement or extension is necessary by the natural expansion and growth of trade of the nonconforming use. For the purposes of determining if an enlargement or expansion . . . meets this requirement, the applicant shall file an application for Special Exception pursuant to the requirements of Article IV of this Ordinance. The applicant must meet all the applicable requirements and criteria of Article IV in addition to providing evidence that the enlargement or extension is necessitated by the natural expansion and growth of trade of the nonconforming use.

ORDINANCE, § 1002(C)(2).[4]

The ZHB's Decision, which was captioned as addressing Penneco's "Application for Variance," described the Application as a "request to permit the expansion of a nonconforming use." (ZHB Decision at 5.) The ZHB summarily determined that Penneco met its burden of proving that adding another UIC well was "a natural expansion of [Penneco's] current existing non[]conforming use and is necessary for the growth of its trade." (FOF ¶ 37.) However, the ZHB also stated that its members, as "residents of the Borough [were] gravely concerned with [Penneco's] use of the property" but felt "constrained under the law to allow" the

---

[4] (O.R. Item 10.)

7

new injection well. (*Id.* ¶ 39.) The Borough appealed the ZHB's decision to common pleas.

Taking no new evidence, and relying substantially on the logic of the ZHB's decision, common pleas affirmed. (Common Pleas' Opinion at 4.) Notably, common pleas did not analyze the extent to which the special exception requirements applied. (*Id.*) The Borough then filed the instant appeal to this Court.

## II. PARTIES' ARGUMENTS

### A. *The Borough*

The Borough begins by noting that applicants must satisfy a zoning ordinance's specific requirements for a special exception. The Borough points out that Section 1002(C)(2) of the Ordinance cross references the requirements of Article IV for special exceptions, concluding that "all of the requirements contained in Article IV . . . [are] applicable to Special Exceptions filed for the expansion of a nonconforming use before the ZHB." (Borough's Brief (Br.) at 29.) It argues that if all of the requirements are applicable, Article IV's special exception requirements for injection wells, (Section 434(A)-(N) of the Ordinance, ORDINANCE, § 434(A)-(N)), apply, requiring a "traffic study, noise management plan, environmental impact analysis, air quality study, hydrological study, geological study, and Pre-Development and Post-Development Soil Testing." (Borough's Br. at 31). It also submits that Penneco failed to prove that its growth of trade required expansion of its nonconforming use. (*Id.* at 32-33.) Accordingly, in the Borough's view, the ZHB erred in not "properly analyz[ing] or consider[ing] in [its] Findings of Fact and Conclusions of Law" the above requirements. (*Id.* at 33.)

8

Second, the Borough argues that Section 1002(C)(1) of the Ordinance, which prohibits, generally, the extension, expansion, or moving of any nonconforming use, bars Penneco from "moving" a nonconforming use, though the Borough does acknowledge that subsection (C)(2) is an exception to that general rule. (*Id.* at 36.) It nonetheless argues that because "an injection well does not currently exist at the proposed location . . . the [Ordinance] estops Penneco's proposed expansion into a new area of the subject property." (*Id.*)

It then turns to the specific setback requirements in Section 434 of the Ordinance, which require well operations to be located no fewer than 500 feet from the nearest property line. (*Id.* at 37.) The Borough argues that because the proposed location for the new injection well is less than 500 feet from property lines, the expansion violates Section 434's setback requirements. (*Id.*)

### B. Protect PT

Protect PT's arguments largely track those of the Borough. It emphasizes that Section 405 of the Ordinance, ORDINANCE, § 405, which applies to all special exceptions, requires traffic studies and a showing that the proposed use will not cause a public health or safety hazard. (Protect PT's Br. at 9-10.) Protect PT reasons that the Ordinance required Penneco to submit a conditional use application by way of Section 434(C)(8), which provides that "[c]hanges in the site plan, including . . . any expansion of the ground surface area used and/or devoted towards drilling operations, requires a new conditional use approval. . . ." (ORDINANCE, § 434(C)(8).)

Protect PT also believes that the natural expansion doctrine does not apply to Penneco, setting forth three distinct reasons. First, "[i]f Penneco is considered to be changing the use of its current production well on the property into an injection well,

9

then that change is not sufficiently similar to invoke the doctrine of natural expansion." (Protect PT's Br. at 16.) Protect PT appears to characterize the nonconforming use in general as the operation of production wells, as it states "[i]f Penneco is arguing that [it is] expanding [its] non[]conforming use to the existing production well, then [it is] impermissibly changing the use of that well, because an injection well is not 'sufficiently similar' to the current production well." (*Id.* at 20.) Protect PT also asserts that expansion of nonconforming uses is subject to setback requirements, and that applicants must seek a variance where the nonconforming use would violate a dimensional requirement of an ordinance. (*Id.* at 21.) It argues that "Penneco could potentially be considered to be moving the location of the current injection well to a new location on the same property," which in Protect PT's view, is not permissible. (*Id.* at 22.)

Finally, Protect PT asserts that the natural expansion doctrine does not permit uses that "would have an adverse impact on the public's health, safety, or welfare." (*Id.* at 24.) It argues that record evidence from the hearing shows that the expansion is injurious to public health and safety, and that Penneco failed to prove otherwise. (*Id.*)

### C. Penneco

Penneco argues that the ZHB correctly interpreted the Ordinance to not require the Article IV requirements to which Objectors point, and that the ZHB's interpretation is entitled to deference. (Penneco's Br. at 17.) In its view, because Penneco seeks expansion of a preexisting, nonconforming use and not a new special exception or conditional use, Article IV of the Ordinance does not apply. (*Id.* at 18.) Penneco roundly rejects the Borough and Protect PT's argument that Section

10

1002(C)(1) of the Ordinance applies, noting that it is "simply incorrect" that Penneco is moving a nonconforming use—it is expanding one. (*Id.* at 19.) It asserts that the only applicable provision of Article IV is strictly procedural, namely Section 404 of the Ordinance, ORDINANCE, § 404 ("Special Exception Procedure for Approval"). (*Id.* at 20.) It is entitled, Penneco argues, to expansion of its nonconforming use under Pennsylvania law. (*Id.* at 21.) It asserts that the ZHB's interpretation of the Ordinance is the only correct one because application of the irrelevant provisions of Article IV would render Penneco's right to natural expansion "meaningless." (*Id.* at 22.) Penneco also urges this Court to disregard "[a]ny attempt to misconstrue Penneco's [A]pplication before the ZHB as seeking a change in use . . . because Penneco made no such application." (*Id.* at 23.)

Penneco argues that the ZHB correctly concluded that the nonconforming use here will not be detrimental to public health, safety, or welfare. (*Id.* at 25, 29-31.) In its view, the Borough and Protect PT had the opportunity to cross-examine Penneco's witness and put forth their own evidence. Penneco asserts that "[a]fter consideration of the substantial evidence presented, the ZHB appropriately weighed it and reached a conclusion." (*Id.* at 25.) Penneco also argues that sufficient evidence supports the ZHB's finding that expansion is necessary for Penneco's business based on increase in customer demands and inability to meet customers' needs without expansion. (*Id.* at 26-28.)

## III. DISCUSSION

### A. Standard of Review

When common pleas takes no additional evidence, we must limit our review to whether the ZHB "committed an abuse of discretion or an error of law."

11

*Harrisburg Gardens, Inc. v. Susquehanna Twp. Zoning Hearing Bd.*, 981 A.2d 405, 410 (Pa. Cmwlth. 2009). We will find that a ZHB has abused its discretion where it has made factual findings that are not supported by substantial evidence. *Bene v. Zoning Hearing Bd. of Windsor Twp.*, 550 A.2d 876, 879 (Pa. Cmwlth. 1988). We apply this deferential standard of review because we do not sit as "a super [zoning hearing board]" and thus "[t]he necessity must be clear before there is justification for judicial interference with the municipality's exercise of its zoning power." *Robert Louis Corp. v. Bd. of Adjustment of Radnor Twp.*, 274 A.2d 551, 555 (Pa. Cmwlth. 1971).

Where a zoning hearing board's interpretation of its ordinance is at issue, we must "begin[] with examination of the text itself." *Gouwens v. Indiana Twp. Bd. of Supervisors*, 260 A.3d 1029, 1037-38 (Pa. Cmwlth. 2021). As a general rule, "a zoning board's interpretation of its zoning ordinance is to be given great weight as representing the construction of a statute by the agency charged with its execution and application." *In re Brickstone Realty Corp.*, 789 A.2d 333, 339 (Pa. Cmwlth. 2001). However, we will not defer to a zoning hearing board's interpretation where such interpretation is "clearly erroneous," and generally, a board's failure to heed the plain text of the ordinance amounts to legal error which this Court will not ignore. *Gouwens*, 260 A.3d at 1037-38.

## B. *Applicability of the Doctrine of Natural Expansion*

A threshold issue is whether the doctrine of natural expansion applies in the first instance.[5] In its supplemental brief, the Borough largely reiterates the

---

[5] On November 14, 2023, the Court requested supplemental briefing on the applicability of two cases: *Pennridge Development Enterprises, Inc. v. Volovnik*, 624 A.2d 674 (Pa. Cmwlth. **(Footnote continued on next page…)**

12

arguments it advanced in its opening brief. Protect PT argues in its supplemental brief that *Pennridge Development Enterprises, Inc. v. Volovnik,* 624 A.2d 674 (Pa. Cmwlth. 1993), and *Smith v. Zoning Hearing Board of Conewago Township*, 713 A.2d 1210 (Pa. Cmwlth. 1998), are not applicable to the resolution of this case. First, it points out that the UIC use is not permitted by conditional use in the RR district, so the ZHB did not err in concluding the doctrine of natural expansion applied in the first instance. However, it emphasizes that "a nonconforming use is not entitled to greater rights tha[n] those afforded a conforming use." (Protect PT's Supplemental Br. at 9 (quoting *Pennridge*, 624 A.2d at 677).) It flows from that proposition, it argues, that not requiring Penneco to comply with all conditional use criteria would amount to "afford[ing Penneco] greater rights than those afforded to a conforming use." (*Id.*) In its supplemental brief, Penneco points out that UIC wells are only allowed by conditional use in the Heavy Industrial (HI) zoning district. Because the UIC use on the property remains a preexisting, nonconforming use, and it remains prohibited in the RR district, it argues *Pennridge* and *Smith* do not apply.[6]

With these arguments in mind, we turn to the relevant law. The doctrine of natural expansion is as old as Euclidean zoning itself.[7] Almost a century ago, our Supreme Court explained that where a given use of property predates a zoning ordinance purporting to restrict that use,

> the [municipality is] without power to compel a change in the nature of the use, or prevent the owner from making such necessary additions to the existing structure as were needed to provide for its natural

---

1993), and *Smith v. Zoning Hearing Board of Conewago Township*, 713 A.2d 1210 (Pa. Cmwlth. 1998). (Order 11/14/23.)

[6] Penneco's supplemental reply brief largely reiterates points it made in its initial brief.

[7] 1927 is the year the Pennsylvania Supreme Court, citing *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365 (1926), upheld a zoning ordinance in *Appeal of Ward*, 137 A. 630 (Pa. 1927), ushering in zoning regulation in the Commonwealth as we know it today.

expansion and the accommodation of increased trade, so long as such additions would not be detrimental to the public welfare, safety[,] and health.

*In re Gilfillan's Permit*, 140 A. 136, 138 (Pa. 1927).

In the leading case on this issue, *Silver v. Zoning Board of Adjustment*, 255 A.2d 506 (Pa. 1969), our Supreme Court struck down as unconstitutional a zoning ordinance which prevented the expansion of nonconforming apartment buildings. In *Silver*, the owner of an apartment building desired to increase the number of units in the building from 46 to 50, which "would be accomplished . . . by subdividing larger apartments[,]" and the zoning board there denied a permit to do so, looking to the zoning ordinance. *Id.* at 507. In holding for the apartment building owner, the Supreme Court concluded that "the tenor of [its prior] decisions [is] that the right of natural expansion is a constitutional right protected by the due process clause." *Id.*

Of course, to trigger the right recognized in *Silver*, the property owner must be able to demonstrate the use in question amounts to a preexisting, nonconforming use in the first instance. A nonconforming use is one that "does not comply with present zoning provisions but which existed lawfully and was created in good faith prior to the enactment of the zoning provision." *Pennridge*, 624 A.2d at 675.[8] We have explained, "[a] lawful nonconforming use is a vested property right which cannot be abrogated or destroyed unless it is a nuisance, or it is abandoned by the owner, or it is extinguished by eminent domain." *Id.* That said, "[t]here is no constitutional right to require that a municipality maintain a use as nonconforming." ROBERT S. RYAN, PA. ZONING LAW & PRAC. § 7.4.6 (2022). Therefore, if a municipality changes a zoning ordinance to allow a given use by conditional use

---

[8] The Ordinance tracks this definition: a "use . . . that does not comply with the applicable provisions in this Ordinance . . . , where such use was lawfully in existence prior to the enactment of this Ordinance[.]" Section 202 of the Ordinance, ORDINANCE, § 202.

14

where it was once not allowed, the property can no longer be characterized as a nonconforming use to which the doctrine of natural expansion is applicable. *Smith*, 713 A.2d at 1213; *Pennridge*, 624 A.2d at 676.

Here, the Ordinance, enacted in 2017, **does** allow UIC wells as a conditional use in the Borough. Section 318 of the Ordinance, ORDINANCE, § 318; Table of Authorized Uses (Table 11).[9] However, it **only** allows them as a conditional use in the **HI** zoning district, not in the RR district at issue in this Application. Section 315 of the Ordinance, ORDINANCE, § 315; Table 11. The UIC well currently in existence at the property was not permitted by the zoning ordinance in effect when common pleas granted site-specific relief. *Penneco*, 205 A.3d at 402-04. And because the Ordinance still does not permit UIC wells in the RR district, the UIC well use on the property remains a preexisting, nonconforming use. As such, the doctrine of natural expansion does apply in this instance. *Cf.* RYAN, PA. ZONING LAW & PRAC. § 7.4.6.

*C. Necessity of the Expansion*

Having concluded this case implicates the natural expansion doctrine, we next address the Borough's argument that the ZHB erred in concluding Penneco's proposed expansion is necessary to support the expansion of its growth or trade where, in the Borough's view, substantial evidence did not support that finding.

The right to natural expansion of an existing nonconforming use "must be shown to be **needed** to provide for natural expansion and the accommodation of increased trade." *Harrisburg Gardens, Inc.*, 981 A.2d at 411-12 (declining to invoke

---

[9] Notably, while UIC wells are permitted as a conditional use **only** in the HI district, Oil and Gas Compressor Stations, Oil and Gas Processing Plans, and Oil and Gas Wells/Pads are permitted as conditional uses in the RR zoning district, as well as the Light Industrial and HI zoning districts. Table 11.

the doctrine of natural expansion where record was "bereft of any evidence . . . as to the **necessity** of the activity at issue as an element of the purported expansion") (emphasis in original) (internal quotation marks and citation omitted). We have explained that "the expansion or modernization [must be] a matter of necessity for the business rather than merely to take advantage of an increase in business" for the doctrine to be triggered. *Richards v. Borough of Coudersport Zoning Hearing Bd.*, 979 A.2d 957, 967 (Pa. Cmwlth. 2009) (citation omitted). The prerequisite that the expansion be a matter of **necessity** derives from the *Silver* Court's explanation that "it is inequitable to prevent [a landowner] from expanding [an existing nonconforming use] **as the dictates of business or modernization require**." *Silver*, 255 A.2d at 507 (emphasis added).

Accordingly, for a zoning hearing board to find the doctrine of natural expansion applicable in a given scenario, it must make sufficient findings of fact to support a conclusion that the expansion is necessary. Section 908 of the Pennsylvania Municipalities Planning Code[10] (MPC) requires that "each decision [of a zoning hearing board] shall be accompanied by findings of fact and **conclusions based thereon** with the **reasons therefor**." 53 P.S. § 10908(9) (emphasis added). We have explained that zoning hearing boards must present "essential findings of fact, conclusions of law, and sufficient rationale to demonstrate that its action was **reasoned and not arbitrary**." *Taliaferro v. Darby Twp. Zoning Hearing Bd.*, 873 A.2d 807, 816 (Pa. Cmwlth. 2005) (emphasis added).

We find ourselves in a similar position to that of the Court in *Mill-Bridge Realty, Inc. v. Manchester Township Zoning Board of Adjustment*, 286 A.2d 483 (Pa.

---

[10] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. § 10908(9).

16

Cmwlth. 1972). There, in the context of a zoning hearing board's grant of special exceptions, President Judge Bowman observed that

> on the present state of the record, we cannot properly exercise even our limited function of review, **for while we have an ample record before us** containing the complete testimony presented to the [zoning hearing board] as well as the exhibits . . . **we are unable to determine on what basis** the [zoning hearing board] made its decision. Were we to make an independent review of the record and to make a decision . . . we would be assuming the role assigned to the [zoning hearing board].

*Id.* at 485 (emphasis added). Notably, the *Mill-Bridge* Court explained that even though the appellant there had not specifically based its argument on Section 908(9) of the MPC,[11] the Court could "[]not ignore this failure[,] as compliance by the [zoning hearing board] is essential to our reviewing responsibility[,]" reasoning that the Court could not "assess the substantive merits of the appeal absent such findings." *Id.* at 486. Therefore, it remanded the matter to the court of common pleas with instructions for that court to remand to the zoning hearing board to comply with Section 908(9) and make the required findings.

Here, the ZHB, in a conclusory fashion, stated that Penneco "met its burden when it provided competent evidence that the addition of another injection point . . . is a natural expansion of the current existing non[]conforming use and is necessary for the growth of its trade." (FOF ¶ 37.)[12] However, the ZHB made **no factual findings**, nor did it explain its reasoning, to support that conclusion. The ZHB did not specify which "competent evidence" it credited with respect to this issue. And

---

[11] The relevant text of Section 908(9) has remained unchanged since the Court's decision in *Mill-Bridge*. *See Mill-Bridge*, 286 A.2d at 485.

[12] Although the ZHB does not distinguish between findings of fact and conclusions of law in its Decision, it is clear that paragraph 37 is a conclusion of law, as it applies a legal principle to a particular set of facts.

17

while Penneco points to evidence in the record that might elucidate the ZHB's conclusion, the bottom line is that the ZHB has not made sufficient findings of fact for us to engage in meaningful appellate review as to this conclusion. For us to comb through the record for evidence on which the ZHB made no findings or credibility determinations would require us to act as fact finder and abandon our proper, limited role as an appellate tribunal. We decline to do so.

In sum, just like the *Mill-Bridge* Court, we have a record before us, but we are unable to meaningfully review the ZHB's legal conclusion as to necessity of the expansion because the ZHB made no specific findings to support that conclusion, nor did it spell out its reasons for arriving at it. Accordingly, we must remand to common pleas with instructions to remand to the ZHB to make adequate findings of fact, and in its discretion, to take additional evidence, to support a conclusion as to the necessity of the expansion of the nonconforming use, *Harrisburg Gardens, Inc.*, 981 A.2d at 411-12, and to fully explain its reasoning, 53 P.S. § 10908(9). Put simply, in the absence of factual findings and reasoning, we are unable to determine whether the ZHB's conclusion is the product of principled reasoning or mere arbitrariness. *Taliaferro*, 873 A.2d at 816.

### D. Applicability of Article IV's Special Exception Requirements

We next consider the extent to which, under the natural expansion doctrine, Article IV's special exception requirements apply in the instant matter. The *Silver* Court was careful to reiterate, consistent with *Gilfillan's Permit*, that the right to natural expansion "is **not unlimited** . . . [; t]he contemplated expansion must not be detrimental to the public health, welfare, and safety. We have never questioned the right of a municipality to impose reasonable restrictions on the expansion of a

18

non[]conforming use." *Silver*, 255 A.2d at 507 (footnotes omitted) (emphasis added).  It made clear that a "municipality **certainly can condition such expansion on certain prerequisites and standards** necessary for the preservation of the health, safety[,] and welfare of the community." *Id.* at 508 (emphasis added).  *See also Tuckfelt v. Zoning Bd. of Adjustment of City of Pittsburgh*, 471 A.2d 1311, 1314-15 (Pa. Cmwlth. 1984) (affirming denial of special exception for expansion of nonconforming use where substantial evidence supported conclusion that such expansion would be "detrimental to the public health, morals, safety, and general welfare of the neighborhood").  In addition, "nonconforming use[s are] not entitled to greater rights tha[n] those afforded a conforming use[.]" *Pennridge*, 624 A.2d at 677.

Special exceptions, we have said, are neither special, nor are they exceptions; rather they are "conditionally permitted use[s], legislatively allowed if the standards are met." *Siya Real Est. LLC v. Allentown City Zoning Hearing Bd.*, 210 A.3d 1152, 1157 (Pa. Cmwlth. 2019) (quoting *Bray v. Zoning Bd. of Adjustment*, 410 A.2d 909, 911 (Pa. Cmwlth. 1980)).  Section 912.1 of the MPC states that where a zoning ordinance provides that special exceptions "be granted or denied by the board pursuant to express standards and criteria, the board shall hear and decide requests for such special exceptions in accordance with such standards and criteria."  53 P.S. § 10912.1.[13]  It follows, then, that a prerequisite to meaningful appellate review in the special exception context is that "there must be findings and conclusions . . . concerning[, *inter alia*,] . . . . whether all [] objective requirements of the [o]rdinance for a special exception have been or will be met[] and whether the proposed use would be against the best interests and welfare of the community." *Allied Servs. for*

---

[13] Section 912.1 was added by Section 91 of the Act of December 21, 1988, P.L. 1329.

*the Handicapped, Inc. v. Zoning & Hearing Bd. of City of Scranton*, 459 A.2d 60, 62 (Pa. Cmwlth. 1983). Remand is appropriate for a zoning hearing board to make the appropriate findings of fact and conclusions of law where they are absent. *Id.*

We note that municipalities often require applicants to proceed via special exception to expand a nonconforming use. *See, e.g.*, *Bernotas v. Zoning Hearing Bd. of City of Bethlehem*, 68 A.3d 1042, 1046 (Pa. Cmwlth. 2013) (relevant ordinance provided for nonconforming use expansion to proceed under special exception though applicant there ultimately needed to seek variance); *Domeisen v. Zoning Hearing Bd. of O'Hara Twp.*, 814 A.2d 851, 855 (Pa. Cmwlth 2003) (applicant seeking expansion of nonconforming use proceeded under special exception and variances); *Tuckfelt*, 471 A.2d at 1314 (applicant seeking expansion of nonconforming use proceeded under special exception and was required to comply with requirements applicable to all special exceptions). A municipality's choice to require applicants to proceed under a special exception to expand a nonconforming use is consistent with the *Silver* Court's observation that municipalities may **require** that applicants satisfy certain conditions as prescribed in an ordinance as a **condition** to expansion. *See Silver*, 255 A.2d at 507 ("We have never questioned the right of a municipality to impose **reasonable restrictions** on the expansion of a non[]conforming use.") (emphasis added).

We now turn to the Ordinance itself. The logical place to start is Article X of the Ordinance, which pertains to "Nonconforming Uses, Structures, and Lots." Section 1002(C)(1) provides, in general that

> no nonconforming use may be extended or expanded in any building or structure, or in or on the lot on which it is located, nor may any nonconforming use be moved to a different location upon the lot on which it is located, so as to alter the use or location which existed at the time the use became nonconforming.

20

ORDINANCE, § 1002(C)(1).

However, Section 1002(C)(2) provides the **exception** to that general rule and explains, consistent with *Silver*, that "no such nonconforming use shall be enlarged or increased or extended to occupy a greater lot area . . . **unless the ZHB shall interpret that the enlargement of or extension is necessary by the natural expansion and growth of trade of the nonconforming use**." *Id.*, § 1002(C)(2) (emphasis added). The Ordinance then directs those seeking to invoke the "expansion and growth of trade" exception to file

> an application for **Special Exception** pursuant to the requirements of Article IV. . . . The applicant must meet **all the applicable requirements and criteria of Article IV** in addition to providing evidence that the enlargement or extension is necessitated by the natural expansion and growth of trade of the nonconforming use.

*Id.* (emphasis added).

Thus, at the outset, we note that Penneco began by proceeding under Article IV, as it styled its Application as a request for a special exception, as directed by the Ordinance. (R.R. at 155a.)[14]

Consistent with the requirements under Section 1002(C)(2), we must turn to Article IV of the Ordinance titled "Express Standards and Criteria for Special Exceptions and Conditional Uses," to determine specifically which requirements from Article IV apply here. Section 404 sets forth procedural requirements for applicants seeking a special exception, and relevant here, it also explains that the applicant has the burden of proving "that the proposed use is authorized as a use by Special Exception and satisfies the specific or objective requirements for the grant

---

[14] Despite the plain text of the Ordinance and the language on the face of the Application, the ZHB came to believe that the Application was not for a special exception, but rather a variance. (ZHB Decision at 5 n.1.)

21

of a use by Special Exception as set forth in this Ordinance." ORDINANCE, § 404(A)(6).[15] It also purports to require the applicant to "demonstrate that the request is not detrimental to the health, safety, and welfare of the neighborhood." *Id.* Section 405 sets forth "General Standards for **all** Conditional Uses and Special Exceptions." *Id.*, § 405 (emphasis added). It requires, *inter alia*, that the applicant "establish by credible evidence that the application complies with all applicable requirements of this Ordinance." *Id.*, § 405(A)(2). It also requires the applicant to show "that the traffic from the proposed use will be accommodated in a safe and efficient manner . . . ." *Id.*, § 405(A)(5). It states that "[t]he proposed use shall not create a significant hazard to the public health[,] safety, and welfare." *Id.*, § 405(A)(7).

Pausing here, we observe that the ZHB made **no findings** with respect to traffic beyond its saying that Penneco's representative testified that no new road

---

[15] In *Bray*, Judge Craig explained in detail how the burdens of proof and persuasion operate and shift in the special exception context. There, we explained that as to **specific requirements** and **objective criteria** for a special exception, applicants bear both the burden of production and the burden of persuasion. 410 A.2d at 913. In general, objectors bear both burdens with respect to "general detrimental effect" (including health, safety, and welfare considerations), and while a given ordinance might **purport** to shift both burdens to the applicant, it can only validly shift the burden of **persuasion** to the applicant, not the burden of production. *Id.* Finally, with respect to general policy concerns (like harmony with the spirit of an ordinance), objectors, invariably and without exception, bear both burdens. *Id.* We more recently summarized:

> [I]f a requirement is interpreted as one upon which the burden is placed on an applicant, but the requirement is nonobjective or too vague to afford the applicant knowledge of the means by which to comply, the requirement is either one that is not enforceable . . . , or, if it relates to public detriment, the burden shifts to an objector, who must demonstrate that the applicant's proposed use would constitute such a detriment.

*Williams Holding Grp., LLC v. Bd. of Supervisors of W. Hanover Twp.*, 101 A.3d 1202, 1213 (Pa. Cmwlth. 2014).

would be necessary and that "truck traffic is estimated to increase from 30 to 45 loads per day." (FOF ¶¶ 26-27.) It made **no specific finding** with respect to **health, safety, and general welfare**.[16] Without any findings as to several requirements for a special exception, we are unable to determine whether Penneco and Objectors met their respective burdens. Indeed, Penneco urges us to essentially infer from the ZHB's lack of finding on the issue that the ZHB made an implicit conclusion with regard to health, safety, and general welfare, having heard, *inter alia*, testimony put forth by Protect PT on that issue. However, as an appellate tribunal, we are not the finder of fact, and it would be inappropriate for us to make such an inference. Moreover, the record belies the suggestion we should accept the ZHB's lack of finding as a positive finding about health, safety, and welfare, as the ZHB indicated it was "gravely concerned with [Penneco's] use of the property." (*Id.* ¶ 39.) Therefore, on remand, the ZHB must carefully consider each of the requirements under Section 405, including health, safety, and general welfare, and make the appropriate findings to support a conclusion as to whether to grant the Application. *City of Scranton*, 459 A.2d at 62.

In sum, consistent with *Silver*, the Borough has placed reasonable restrictions on the expansion of a nonconforming use by requiring applicants to satisfy the requirements applicable to **all** special exceptions. Thus, the foregoing analysis requires us to reject Penneco's suggestion that application of special exception requirements beyond purely procedural ones renders its right to expand its

---

[16] Even if we were to accept Penneco's argument that its right to natural expansion is rendered meaningless by imposition of reasonable zoning requirements, *Silver* **itself**, and its progeny, still requires a showing that expansion of the use would not impinge on health, safety, and general welfare. *Jenkintown Towing Serv. v. Zoning Hearing Bd. of Upper Moreland Twp.*, 446 A.2d 716, 718 (Pa. Cmwlth. 1982). Thus, even relying purely on the caselaw and ignoring the Ordinance, we would still have to remand for the ZHB to make a specific finding as to that important fact.

nonconforming use **meaningless**.[17]  The doctrine of natural expansion does not provide landowners *carte blanche* to expand in violation of reasonable and duly enacted requirements of zoning ordinances.

Section 405(A) of the Ordinance contains relevant requirements for the Application at issue here.  We cannot engage in meaningful appellate review of whether Penneco met its burden as to any of those requirements because the ZHB did not make findings of fact with respect to them.  Therefore, upon remand, the ZHB is to consider those requirements and make findings of fact necessary to reach a conclusion, taking additional evidence as it deems necessary in its discretion, as to

---

[17] In support of the notion that any restrictions beyond Article IV's procedural requirements renders its right to natural expansion meaningless, Penneco cites to, *inter alia*, *Chartiers Township v. William H. Martin, Inc.*, 542 A.2d 985 (Pa. 1988).  However, *Chartiers*' unique procedural posture and factual distinguishability bear mention here.  The land at issue in *Chartiers* was a tract with two valleys.  Until the litigation, the landfill operator that owned the tract had only used the west valley for landfill operations, **though the entire tract was already licensed by the Department of Environmental Resources, predecessor of the DEP, for that use**, and "operation and maintenance of a landfill . . . exist[ed] as a legal nonconforming use" under the ordinance. *Id.* at 986.

Notably, the *Chartiers* litigation did **not** involve the request on the part of an applicant to **expand** its operations, but rather a municipality seeking to stop a landowner from engaging in a use by seeking injunctive relief.  There, the trial court granted an injunction requested by the township to stop landfill operators from operating in the western valley of the tract.  The trial court granted the injunction, and we lifted the injunction against the landfill operators, granting a stay. *Id.* at 987.  Thus, the issue before the Supreme Court was whether we had properly granted the **stay pending appeal**, and in so analyzing, it turned to factors enunciated in *Pennsylvania Public Utility Commission v. Process Gas Consumers Group*, 467 A.2d 805 (Pa. 1983), one of which is the likelihood of success on the merits. *Chartiers*, 542 A.2d at 987.  Given the fact that the use in question on the **entire** tract in *Chartiers* was already permitted, and that litigation only involved expansion of the business on that tract, the Court found the landfill operator likely to succeed on the merits.  Thus, both as a matter of procedure—*Chartiers* involving analysis of likelihood of success on the merits, not a special exception application—and factually—*Chartiers* involving a tract on which the use was already entirely permitted by the state—we decline to view *Chartiers* as persuasive here.

24

whether Penneco has met the general requirements for a special exception under Section 405(A) of the Ordinance.[18]

## IV. CONCLUSION

On remand from common pleas, the ZHB must consider and make findings of fact as to the requirements for the grant of a special exception for the expansion of a preexisting nonconforming use (Section 1002 of the Ordinance) and the standards applicable to the grant of all special exceptions (Section 405 of the Ordinance). Further, based on our clarification of the findings it must make, the ZHB, in its discretion, may take additional evidence to the extent it believes such additional evidence is necessary. Once it has made the necessary findings of fact, it may then appropriately consider whether to grant or deny the Application.

Despite its perception to the contrary, the ZHB was not powerless—consistent with *Silver* and the Ordinance—to apply the requirements of the natural expansion doctrine and the plain terms of the Ordinance to regulate the location of the proposed expansion of the nonconforming use at issue here. It erred in believing otherwise.

To sum up, the ZHB did not support its conclusion that Penneco's proposed expansion was necessary for the expansion of its trade, as required by our caselaw, with adequate findings of fact and reasoning. Moreover, the Ordinance here requires applicants seeking to expand a nonconforming use due to an increase or growth in trade to proceed via a special exception. Consistent with a municipality's right to condition such right to expansion on compliance with reasonable restrictions, the Ordinance's plain text requires compliance with those requirements applicable to all special exceptions. It was an error of law for the ZHB not to consider those relevant

[18] Because the first issue raised by the Borough is dispositive and requires vacatur and remand, we need not reach the remaining issue.

requirements in Article IV and to proceed as if Penneco had **not** applied for a special exception. Because the ZHB erred in not making specific findings of fact to support its conclusion as to the necessity of the expansion, and as to each of the Ordinance's special exception requirements contained in Section 405, we vacate common pleas' order with instructions to remand to the ZHB to make findings of fact and conclusions of law, and, if the ZHB deems additional evidence necessary, to take such additional evidence, sufficient to determine whether to grant or deny the Application.

_____
**RENÉE COHN JUBELIRER,** President Judge

26

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Plum Borough,                              :
                     Appellant    :
                                                 :
                v.                              :   No. 1198 C.D. 2022
                                                 :
Zoning Hearing Board of the Borough    :
of Plum, Penneco Environmental         :
Solutions, LLC and Protect PT          :

## O R D E R

     **NOW**, January 29, 2024, the Order of the Court of Common Pleas of Allegheny County in the above-captioned matter is **VACATED**, and this matter is **REMANDED** with instructions to remand to the Zoning Hearing Board of the Borough of Plum to make findings of fact and conclusions of law consistent with the foregoing opinion, taking additional evidence if it deems necessary to enable such factfinding.

     Jurisdiction relinquished.

 

                                      _____
                                      **RENÉE COHN JUBELIRER,** President Judge